44 A.3d 1085

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. J.A.C., DEFENDANT–APPELLANT.

Argued November 9, 2011—Decided June 14, 2012.

284

*Michael B. Jones,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney; *Mr. Jones* and *William P. Welaj,* Designated Counsel, on the briefs).

*Mary E. McAnally,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney).

PATTERSON, J., delivered the opinion of the Court.

New Jersey's Rape Shield Law, *N.J.S.A.* 2C:14–7, protects the privacy of a victim of sexual assault against unwarranted exploration of his or her character and conduct. The Legislature recognized that the fair trial constitutionally guaranteed to a defendant should focus upon the crime alleged, not the history or habits of the victim. The statute and the case law construing it require trial judges to carefully balance the need to permit thorough exploration of issues relevant to the defendant's guilt or innocence against the protection of victims who report their alleged abusers.

Today the Court is required to apply *N.J.S.A.* 2C:14–7 to a case in which defendant contended that the child victim fabricated the allegations against him to deflect attention from her own misconduct. At the age of twelve, C.A. alleged that defendant J.A.C., her mother's former boyfriend, had sexually abused her on multiple occasions when she was nine years old. C.A. accused defendant of abuse in the midst of a family crisis. Her mother had discovered that the child, attempting to impersonate a sexually active college student, had engaged in sexually explicit instant message correspondence with adult men. With her internet communications exposed, C.A. faced serious discipline and the prospect that she would be separated from her home, friends and school, and sent to live with her father in another state.

At his trial, defendant sought to introduce into evidence the content of those internet communications to show that the child's belated allegation of sexual abuse was fabricated to deflect her parents' unwelcome attention to her own behavior. Defendant was permitted to introduce evidence that twelve-year-old C.A. had engaged in sexually explicit communications with adult men whom she met online. He was also allowed to demonstrate that the discovery of the messages deeply distressed C.A.'s family, precipitated upsetting confrontations in the child's home and school, and led C.A.'s parents to seriously consider moving her out of state. This evidence was centrally relevant to defendant's fabrication defense. However, the trial court invoked *N.J.S.A.* 2C:14–7 to bar the introduction into evidence of the actual content of those messages.

Defendant was convicted of first- and second-degree charges of sexual assault and endangering the welfare of a child. An Appellate Division panel affirmed his conviction and sentence of twenty years imprisonment, holding that the trial court had properly applied *N.J.S.A.* 2C:14–7 to bar the admission of the content of the instant messages sent by and to C.A. We granted defendant's petition for certification, limited to the question of whether the

content of the instant messages was properly excluded under *N.J.S.A.* 2C:14–7.

We now affirm. We hold that the content of the instant messages written by and to the victim in this case constitutes "sexual conduct" within the meaning of *N.J.S.A.* 2C:14–7(f), and that content is therefore protected by *N.J.S.A.* 2C:14–7. Accordingly, we apply the two-pronged analysis set forth in *State v. Budis,* 125 *N.J.* 519, 532–34, 593 *A.2d* 784 (1991), and *State v. Garron,* 177 *N.J.* 147, 827 *A.2d* 243 (2003), *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.2d* 1204 (2004). That analysis requires that trial courts evaluate the relevancy and necessity of the disputed evidence and balance its probative value against its prejudicial effect. We conclude that in this case, the trial court conducted the careful inquiry required by *N.J.S.A.* 2C:14–7 and our case law. Given the admission of extensive evidence central to defendant's fabrication defense—that C.A. accused defendant of sexual abuse in the setting of a confrontation with her parents and teachers shortly after the discovery of her explicit instant messages—the actual content of the instant messages had little relevance to the issues that were presented at trial. Defendant had a full and fair opportunity to contest the State's charges.

We further hold that any probative value of the content of C.A.'s instant messages is substantially outweighed by its prejudice. The instant messages, unrelated to defendant and written more than two years after the sexual abuse at issue, would have distracted the jury from the issues before it. The confrontation of a victim, still a minor at the time of trial, with her sexually explicit communications made at the age of twelve would do more than invade the privacy of a single child. It could deter young victims of sexual exploitation, fearful of disclosure of their own online communications, from coming forward to report abuse. The test set forth in *Budis* and *Garron* was correctly applied to exclude the content of C.A.'s online communications during defendant's trial, and the Appellate Division panel properly affirmed the decision of the trial court.

I.

C.A. was born in 1991. Following her parents' divorce when C.A. was almost four years old, she moved with her mother and younger brother to New Jersey. C.A.'s mother had primary custody of both children, but her father regularly visited, and the children spent agreed-upon holidays and every summer with their father and his second wife in Indiana. In 1998, C.A.'s mother began dating defendant, a divorced father of one child. In 1999, C.A.'s mother and defendant had a daughter. In November 2000, defendant moved in with C.A.'s mother and the three children. C.A. was nine years old. C.A.'s mother worked several evenings per week, and relied upon a variety of child care arrangements, including the children's grandparents, a babysitter and defendant. When defendant was in charge of the three children, he would prepare their dinner, supervise them and oversee their bedtime routine.

The trial testimony conveyed a stark contrast between defendant's characterization of his relationship with C.A. and the child's account of their interaction. In his pretrial statements, at trial and on appeal, defendant consistently maintained that his relationship with C.A. was entirely appropriate, denied any sexual abuse, and observed that C.A. never indicated any fear or discomfort in his presence. According to defense witnesses who testified at trial, the relationship between C.A. and defendant appeared to outsiders to be normal and affectionate.

According to C.A.'s trial testimony, defendant made her "very uncomfortable" on several occasions shortly after he moved in with her family by touching and rubbing her leg or chest. She stated that defendant twice exposed himself to her, once in her brother's room and once in the living room of her home. C.A. recounted an incident in which defendant suggested that she look at a video game that he was playing on his computer, and when she sat on his lap, he rubbed her between her legs and reached his hands under her pajamas to touch her chest. She said that she

felt uncomfortable, but at nine years old "didn't really know what to do." She did not report these incidents to her mother.

Another incident was initially identified by C.A. to have occurred in the summer of 2001—at a time when she would have been in Indiana with her father—but was later reported by her to have occurred shortly before Christmas of 2000. According to C.A., on a night when her mother was working and her younger siblings were in bed, she was sleeping on a living room couch when defendant called her over to lie down with him. C.A. stated that defendant put his hands down her pants and was "feeling around like, just touching everything." She stated that she was "just scared," and after ten minutes "just kind of yelled at him and ran upstairs" to her mother's room, from which she planned to call her mother and ask that she come home. According to C.A., defendant knelt in front of her in tears, telling the child "you have everything in your hands," begging that she not call and promising to discuss the incident with her mother. C.A. stated that defendant kept talking to her "to relax me and get me calmed down," told her about a Christmas present that she would be receiving, and dissuaded her from calling her mother.

C.A.'s mother stated that when she arrived home at 2:30 a.m. that night, defendant was waiting up for her. According to the child's mother, defendant "told me that [C.A.] was laying on the couch next to him and he put his arm around her because he thought . . . it was me." C.A.'s mother reported that she believed defendant's innocuous account of the incident and gave it no further thought. According to C.A., the next day she was reassured by her mother that her mother knew about the incident, and said it "was okay and I shouldn't like be worried." C.A. testified that she assumed her mother knew about the abuse and condoned it, and accordingly she "didn't bring it up any more."

The relationship between defendant and C.A.'s mother ended the following year when he became involved with another woman, and he moved out of C.A.'s home in August 2001. Defendant and several defense witnesses testified at trial about the stormy con-

clusion of this relationship, after which C.A.'s mother vandalized his property and the couple battled over defendant's visitation with their two-year-old daughter. Thereafter, C.A. had little contact with defendant.

Over several days in March 2003, C.A.—then twelve—engaged in instant message conversations with seventeen adult men. The communications between C.A. and six of those men included sexually explicit language. In her instant messages, C.A. did not mention defendant, report any history of sexual abuse or weave together an intelligible narrative. Instead, C.A. peppered her communications with sexual vulgarities—learned, she reported, by reading the online exchanges of others—as she attempted to impersonate a sexually experienced adult using the internet to seek encounters with strangers.

On March 26, 2003, C.A.'s mother discovered the instant messages. She notified some of the adults with whom C.A. had been communicating that they had been instant messaging with a child, confronted her daughter, and notified C.A.'s father, who immediately drove from Indiana to New Jersey. The events of the next two days were disquieting for C.A., as her parents and teachers reacted to the revelation of her online behavior. She stayed home from school as her parents pressed her to explain the instant messages. Both parents considered the child's immediate move from her New Jersey home to her father's family in Indiana. C.A.'s mother thought that C.A. might have "a little more stability there because he was married and his wife was home all day[.]" C.A. was immediately told that she was prohibited from using the telephone and computer and from visiting with her friends. C.A.'s school guidance counselor, notified that C.A.'s parents were considering moving her out of state, arranged a meeting with the parents and the child's homeroom teacher.

That meeting, on March 28, 2003, was the setting in which C.A. accused defendant of sexual abuse. C.A. sat silently for most of the meeting as her parents and educators discussed her conduct and her potential move to a new home and school in Indiana. Although they were advised about the instant messages, the

teacher and guidance counselor strongly opposed the proposal of an immediate move out of state. The teacher questioned C.A. about why she wrote sexually explicit instant messages, and how she had learned the language that appeared in some of her internet communications. According to the teacher, she asked C.A. whether anyone had "touched" her. C.A. said that defendant had "fingered" her. She explained that she had assumed that her mother had known about defendant's contact with her, because defendant had assured her that he would discuss that contact with her mother and her mother had told her that he had done so. C.A.'s mother attempted to clarify to her daughter that defendant had only admitted to an accidental embrace of the child after mistaking her for her mother. According to the testimony of the mother and educators, the meeting ended with an emotional conversation between C.A. and her mother in which they discussed the alleged abuse and the mother's prior misunderstanding of what had occurred.

The school contacted the police, and C.A., her parents and teachers were questioned. Defendant was arrested and charged in connection with C.A.'s allegations. Following the police investigation, defendant was also charged with sexual abuse of a former stepdaughter, in 1990, when the stepdaughter was a preteen.

## II.

On November 19, 2003, defendant was indicted on one count of first-degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2(a), six counts of second-degree sexual assault in violation of *N.J.S.A.* 2C:14–2(b), and three counts of second-degree endangering the welfare of a child in violation of *N.J.S.A.* 2C:24–4(a). Three of the second-degree sexual assault charges related to defendant's alleged sexual abuse of his former stepdaughter; all of the remaining charges pertained to C.A. On defendant's motion, the indictment was severed to permit the charges related to each victim to be tried separately.

Defendant moved to compel production of C.A.'s instant messages. In accordance with the trial court's order following an in

camera review, the State turned over instant messages between C.A. and one individual. In August 2005, defendant moved to admit the messages into evidence at trial. He based his motion upon his defense that C.A. had fabricated her allegations against him, as well as the messages' potential to explain C.A.'s familiarity with sexual topics and to provide an alternative source of any injuries that might be found in her physical examination. The trial court found that the instant messages were protected by *N.J.S.A.* 2C:14–7, and permitted them to be used at trial only for the limited purpose of explaining a physical injury to C.A. in the event that the State were to proffer an expert to prove such injury.[1] The trial court also ruled that the fact that C.A. had sent and received explicit messages could be admitted to show that C.A.'s allegation "did not arise until the victim had been officially confronted by the authorities (i.e. to divert attention from the victim by accusing the [d]efendant)."

In April 2006, the State again presented the case to a grand jury and obtained a superseding indictment. With respect to C.A., defendant was indicted on one count of first-degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14–2(a), three counts of second-degree sexual assault in violation of *N.J.S.A.* 2C:14–2(b), four counts of second-degree endangering the welfare of a child in violation of *N.J.S.A.* 2C:24–4(a), and one count of fourth-degree lewdness in violation of *N.J.S.A.* 2C:14–4(a). Preparing for trial on the counts pertaining to C.A., defendant learned through a forensic examination of the child's computer of the existence of instant messages between C.A. and fourteen to seventeen men in addition to the previously identified individual. The trial court held a *Rule* 104 hearing[2] on July 18, 2007, to determine

---

[1] The State elected prior to trial not to present expert testimony to show a physical injury to C.A., so the trial court's ruling that the instant messages could be admitted to counter such expert testimony did not affect the trial.

[2] *N.J.R.E.* 104 permits a trial court to conduct a hearing out of the presence of the jury to determine the admissibility of evidence.

the admissibility of the instant messages to prove that the child's allegations were made as she was confronted with serious misconduct, and were fabricated.

Ultimately, the trial court ruled that defendant could elicit from C.A. and other witnesses evidence showing that C.A. had engaged in "explicit instant message communications" with six individuals, each of whom could be identified by his screen name, but that the specific content of those communications could not be disclosed, and that the evidence would be accompanied by a limiting instruction to the jury.

The State presented the testimony of C.A., her mother, her teacher and her guidance counselor. Defendant elected to testify on his own behalf, and presented the testimony of family members and friends to demonstrate the animosity between C.A.'s mother and defendant after he moved out of C.A.'s home, and the witnesses' observations of his relationship with C.A. and her brother. He also presented the testimony of a secretary at C.A.'s school who took a call from one of C.A.'s parents and was advised that the family was moving the child to Indiana, and the computer expert who conducted the forensic examination of C.A.'s computer. Within the constraints of the trial court's ruling on their admissibility, C.A.'s instant messages and the events following their discovery were prominently featured in the direct and cross-examination of C.A., her mother and her teachers, and in both parties' opening arguments and summations.

On October 31, 2007, the jury convicted defendant on the single count of first-degree aggravated sexual assault, three counts of second-degree sexual assault and three counts of second-degree endangering the welfare of a child. The jury acquitted defendant of one count of second-degree endangering the welfare of a child and one count of fourth-degree lewdness. On January 31, 2008, defendant pled guilty to one count of second-degree sexual assault, one of the severed counts of his indictment that related to abuse of his former stepdaughter in 1990. On that charge, the trial court sentenced defendant to a seven-year sentence. In a June 20, 2008

sentencing hearing on the charges of which he was convicted by a jury, defendant was sentenced to a twenty-year prison term with a ten-year period of parole ineligibility for the single count of first-degree aggravated sexual assault, and a concurrent ten-year prison sentence for the remaining counts, made concurrent with the earlier seven-year sentence.

An Appellate Division panel affirmed defendant's conviction and sentence on January 7, 2011. The panel held that C.A.'s instant messages constituted "sexual conduct" under *N.J.S.A.* 2C:14–7(f), regardless of whether the activity to which they referred represented fact or fantasy. The panel noted the absence of a nexus between the substance of the messages and the issues determined in defendant's trial. It remanded for correction of the sentence in light of the trial court's merger of four counts of the indictment.

Defendant filed a petition for certification in this Court, and we granted certification "limited to the issue of whether defendant should have been permitted to introduce the sexually explicit content of the instant messages sent by the minor, female victim to other adult males." *State v. J.A.C.*, 205 *N.J.* 519, 16 *A.*3d 384 (2011).

### III.

Defendant contends that the trial court hindered his effort to present a fabrication defense by limiting the admissibility of the victim's instant messages. He focuses on several messages that suggest that C.A. was sexually active at the time that she wrote them. Defendant contends that if these messages are fictional, they are unprotected by *N.J.S.A.* 2C:14–7(f) because—like prior false claims of sexual abuse—they are not "previous sexual conduct" within the meaning of the statute. Defendant further argues that if these messages do not reflect actual sexual activity, they show a propensity to invent fictional accounts of events, and thus would have bolstered his fabrication defense at trial. Defendant argues that if these messages reflect actual sexual activity,

they are highly relevant and would have provided to the jury essential context for their understanding of C.A.'s sexual abuse allegations.

The State counters that the trial court undertook a precise and balanced inquiry in applying *N.J.S.A.* 2C:14–7(f) to C.A.'s instant messages. On the relevance prong of the test of *N.J.S.A.* 2C:14–7 and this Court's decisions in *Budis* and *Garron*, the State notes that none of the instant messages refer to defendant or to C.A.'s allegations against him. The State argues that defendant was afforded a full opportunity to present to the jury the fact that C.A. faced serious punishment for her messages when she accused defendant of sexual abuse. Addressing the second prong of the test of *Budis* and *Garron*, the State contends that any probative value of the evidence is far outweighed by its prejudice.

## IV.

We review the trial court's evidentiary ruling under a deferential standard; it should be upheld " 'absent a showing of an abuse of discretion, *i.e.,* there has been a clear error of judgment.' " *State v. Brown,* 170 *N.J.* 138, 147, 784 *A.*2d 1244 (2001) (quoting *State v. Marrero,* 148 *N.J.* 469, 484, 691 *A.*2d 293 (1997)). An appellate court applying this standard "should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.' " *Ibid.* (quoting *Marrero, supra,* 148 *N.J.* at 484, 691 *A.*2d 293).

*N.J.S.A.* 2C:14–7 serves "to protect the privacy interests of the victim while ensuring a fair determination of the issues bearing on the guilt or innocence of the defendant." *State v. Schnabel,* 196 *N.J.* 116, 128, 952 *A.*2d 452 (2008) (quoting *Garron, supra,* 177 *N.J.* at 147, 827 *A.*2d 243). The statute guards against "unwarranted and unscrupulous foraging for character-assassination information about the victim." *State v. P.S.,* 202 *N.J.* 232, 261, 997 *A.*2d 163 (2010) (quotation omitted). *N.J.S.A.* 2C:14–7(a) provides that in prosecutions for specified sexual offenses, "evidence of the victim's previous sexual conduct shall not be admitted

nor reference made to it in the presence of the jury except as provided in this section." The statute requires a defendant seeking to admit such evidence for any purpose to apply for a pretrial order, and compels a preliminary hearing:

> After the application is made, the court shall conduct a hearing in camera to determine the admissibility of the evidence. If the court finds that evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material and meets the requirements of subsections c. and d. of this section and that the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim, the court shall enter an order setting forth with specificity what evidence may be introduced and the nature of the questions which shall be permitted, and the reasons why the court finds that such evidence satisfies the standards contained in this section. The defendant may then offer evidence under the order of the court. [*N.J.S.A.* 2C:14-7.]

The statute was originally enacted in 1978 as part of the creation of New Jersey's Criminal Code. The purpose of the statute was to "strictly limit[ ] the introduction of evidence of the victim's previous sexual conduct" in the trial of several enumerated offenses. *Statement to Senate Bill No. 738*, at 56 (May 15, 1978). The original statute presumptively excluded evidence of a victim's sexual conduct occurring more than one year before the charged offense absent a clear and convincing showing that the evidence was relevant and that the probative value was not outweighed by its prejudicial effect. The law was amended in 1988 to specifically address evidence pertaining to child victims of sexual abuse. *L.* 1988, *c.* 69. The Assembly Judiciary Committee's statement to the proposed amendment explained that the statute excluded "certain information regarding a child's past history of abuse, sexual experimentation, or sexual conduct from a jury's consideration when the child is the complaining witness" in a case involving a sex crime. *Statement to Assembly Bill No. 641*, at 1 (Feb. 18, 1988). That amendment also added endangering the welfare of a child, *N.J.S.A.* 2C:24-4, to the list of crimes to which *N.J.S.A.* 2C:14-7 applied. *L.* 1988, *c.* 69, § 1(a).

Responding to the "Glen Ridge sexual assault trial, in which the defendants were allowed to bring in evidence of the developmen-

tally disabled victim's past history and discuss it, in great detail, in open court," the Legislature strengthened *N.J.S.A.* 2C:14-7 in a 1994 amendment to include the stringent evidentiary standard reflected in the present version of the statute. *Statement to Assembly Bill No. 677*, at 1 (Jan. 20, 1994). In doing so, supporters of the bill acknowledged the importance of "strik[ing] an appropriate balance between protecting a defendant's constitutional rights, and protecting a rape victim from an assault upon the victim's character." *Ibid.* The Legislature therefore amended the statute to limit the admissibility of such evidence to instances in which the sexual conduct of the victim is "relevant and highly material," and that "the probative value of the evidence offered substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." *L.* 1994, *c.* 95, § 1(a) (codified as amended at *N.J.S.A.* 2C:14-7(a)). The amendment also deleted a provision in the prior version of the statute that had permitted a defendant to introduce evidence of the victim's prior sexual history to show a lack of force or coercion. *L.* 1994, *c.* 95, § 1(d). It amended the definition of "sexual conduct" to its present language, which inclusively defines the term:

> For the purposes of this section, "sexual conduct" shall mean any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangements and life style.

[*N.J.S.A.* 2C:14-7 (f).]

Finally, a 1995 amendment prohibited defendants from introducing evidence regarding the manner in which the victim was dressed at the time of the offense. *L.* 1995, *c.* 237, § 1(e). It is clear from this series of amendments progressively strengthening *N.J.S.A.* 2C:14-7, that the Legislature's policy is to direct the focus of sexual assault trials toward the alleged crime, and away from the lifestyle of the victim.

V.

The Legislature's expression of policy is subject to constitutional constraints. The United States and New Jersey Constitutions ensure to criminal defendants " 'a meaningful opportunity to present a complete defense.' " *Garron, supra,* 177 *N.J.* at 168, 827 *A.*2d 243 (quoting *Crane v. Kentucky,* 476 *U.S.* 683, 690, 106 *S.Ct.* 2142, 2146, 90 *L.Ed.*2d 636, 645 (1986)). As the Court noted in *Garron,* the constitutional rights of confrontation and compulsory process have "long been recognized as essential to the due process right to a 'fair opportunity to defend against the State's accusations,' and thus [are] 'among the minimum essentials of a fair trial.' " *Id.* at 169, 827 *A.*2d 243 (quoting *Chambers v. Mississippi,* 410 *U.S.* 284, 294, 93 *S.Ct.* 1038, 1045, 35 *L.Ed.*2d 297, 308 (1973)). These rights, however, are "not absolute, and may, in appropriate circumstances, bow to competing interests." *Budis, supra,* 125 *N.J.* at 531, 593 *A.*2d 784 (citing *Chambers,* 410 *U.S.* at 295, 93 *S.Ct.* at 1046, 35 *L.Ed.*2d at 309). The Court afforded to trial courts "wide latitude ... to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 532, 593 *A.*2d 784 (quotation omitted).

In *Budis* and *Garron* this Court departed from the literal language of *N.J.S.A.* 2C:14–7(a), which requires evidence of a victim's previous sexual conduct to be "relevant and highly material," and to have probative value that "substantially outweighs" its collateral nature or prejudicial effect. In *Budis,* the Court held that to avoid a violation of the federal and New Jersey constitutional rights to confrontation and compulsory process, *N.J.S.A.* 2C:14–7 should be construed to permit evidence of a victim's sexual conduct if "the evidence [is] relevant to the defense ... [and] its probative value outweighs its prejudicial effect." *Budis, supra,* 125 *N.J.* at 532, 593 *A.*2d 784. That test was reaffirmed and refined in *Garron,* in which the Court held that "evidence relevant to the defense that has probative value outweighing its

prejudicial effect must be placed before the trier of fact," and concluded that "evidence that is relevant and necessary to prove the defense of consent," which was at issue in that case, would be admitted. *Garron, supra,* 177 *N.J.* at 172–73, 827 *A.*2d 243.

On the first component of the test—the relevancy of the evidence at issue—the definition of relevance found in *N.J.R.E.* 401 provides guidance: " '[r]elevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *See also State v. Cuni,* 159 *N.J.* 584, 601, 733 *A.*2d 414 (1999). The trial court evaluates the nexus between the evidence protected by *N.J.S.A.* 2C:14–7 and the issues to be decided by the factfinder. In *Budis,* for example, the Court identified two respects in which the evidence in dispute— the victim's prior sexual abuse by her stepfather—was potentially relevant to the child sexual abuse case at issue: "[f]irst, [the evidence] rebuts the inference that [the victim] acquired the knowledge to describe sexual matters from her experience with defendant [and] [s]econd, the evidence is relevant to show that [the victim] had the knowledge to initiate the sexual acts as described by defendant." *Budis, supra,* 125 *N.J.* at 534, 593 *A.*2d 784 (citation omitted).

■ Similarly, this Court considered the precise relationship between the evidence proffered in *Garron,* a history of flirtatious and suggestive communication between the defendant and the victim, and the contentions of the defendant. It noted that "[h]ow defendant's prior relationship with [the victim] affected his state of mind was critical to the ultimate determination of the jury" on the pivotal issue of consent. *Garron, supra,* 177 *N.J.* at 173–74, 827 *A.*2d 243. The first prong of the test thus requires the trial court to determine whether evidence covered by *N.J.S.A.* 2C:14–7 is relevant and necessary to resolve a material issue, taking into account the other evidence that is available to address that issue.

■ The second prong of the analysis set forth in *Budis* and *Garron* requires the court to balance the probative value of the contested evidence against its prejudicial impact. The "probative

value" of evidence is "its tendency to establish the proposition that it is offered to prove." *Garron, supra,* 177 *N.J.* at 167 n. 2, 827 *A.*2d 243 (citing *State v. Wilson,* 135 *N.J.* 4, 13, 637 *A.*2d 1237 (1994)). The probative value of sexual conduct covered by *N.J.S.A.* 2C:14–7 "depends on clear proof that [the conduct] occurred, that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense." *Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784 (citing *State v. Pulizzano,* 155 *Wis.*2d 633, 456 *N.W.*2d 325, 335 (1990)). There is, accordingly, substantial overlap between the relevancy determination that is the first step of the *Budis* and *Garron* test, and the measure of the "probative value" for purposes of the second step.

 For purposes of this analysis, the potential "prejudice" of evidence encompasses its impact upon the victim of sexual abuse whom *N.J.S.A.* 2C:14–7 was enacted to protect—in this case a child. "[T]he court should consider the likely trauma to the child and the degree to which admission of the evidence will invade the child's privacy," and "guard against excessive cross-examination" of the victim. *Budis, supra,* 125 *N.J.* at 533, 593 *A.*2d 784. Consistent with the balancing test of *N.J.R.E.* 403, a trial court should consider the impact of a given ruling on a victim reporting sexual abuse, and should guard against jury confusion and misleading inquiry. As the Court noted in *Budis,* evidence of a child's sexual activity "may divert the jury's attention from the behavior of the defendant to that of the victim. For example, the evidence may mislead a jury to conclude that one who assaults a more sexually experienced child is not culpable, especially if the child initiated the encounter." *Id.* at 534, 593 *A.*2d 784. *N.J.S.A.* 2C:14–7 and the case law mandate caution in the use of evidence with the potential to distract the jury from the material issues before it.

In short, in accordance with our construction of *N.J.S.A.* 2C:14–7, trial courts are required to carefully weigh the relevance, necessity and impact of evidence relating to a victim's sexual

history, and to impose case-specific parameters, where appropriate, to any such evidence admitted.

## VI.

After an evidentiary hearing conducted pursuant to *Rule* 104, the trial court permitted defendant to support his defense of fabrication with evidence that C.A. accused him of sexual abuse shortly after she was confronted with her explicit instant messages and was threatened with an unwanted move to Indiana, but barred the introduction into evidence of the content of the messages. We review the trial court's evidentiary ruling, entitled to substantial deference under the "abuse of discretion" standard of review, in light of the Legislature's objective in enacting *N.J.S.A.* 2C:14-7 and this Court's construction of the statute.

The first inquiry is whether the instant messages constitute "sexual conduct" within the meaning of *N.J.S.A.* 2C:14-7(f), which encompasses "any conduct or behavior relating to sexual activities of the victim." Such conduct or behavior may include speech. In *Garron*, this Court suggested that sexual speech could qualify as "sexual conduct" under *N.J.S.A.* 2C:14-7 when it is part of a continuing course of conduct that involved both sexually charged comments and physical contact. *Garron, supra,* 177 *N.J.* at 176-77, 827 *A.*2d 243.

Here, C.A.'s instant messages—evidently intended to convey the impression that she was sexually experienced—included references to purported activity and sexual advances to her adult correspondents. The child's apparent invention of most or all of the content of her messages does not deprive her of the protection of *N.J.S.A.* 2C:14-7. Sexual conduct that is a matter of fantasy rather than fact has frequently been protected in federal and state courts.[3] As noted in the Advisory Committee Notes to the 1994

---

[3] Sexual activity in the form of communications that convey fantasy rather than fact, as may have occurred here, should not be confused with a victim's

Amendments to *Fed.R.Evid.* 412, construing the term "sexual behavior" in the federal counterpart to *N.J.S.A.* 2C:14–7, "the word 'behavior' should be construed to include activities of the mind, such as fantasies or dreams." *See also United States v. Papakee,* 573 *F.*3d 569, 572 (8th Cir.2009); *B.K.B. v. Maui Police Dep't,* 276 *F.*3d 1091, 1105 (9th Cir.2002); *Wolak v. Spucci,* 217 *F.*3d 157, 159–60 (2d Cir.2000). Whether C.A.'s attempts to impersonate an experienced adult communicated fact or fantasy, the instant messages clearly constituted "sexual conduct" as broadly defined in *N.J.S.A.* 2C:14–7(f). The trial court's determination that the communications fell within the scope of the Rape Shield Law was correct.[4]

Accordingly, we apply the test of *Budis* and *Garron* to C.A.'s instant messages. Because the trial court permitted defendant to introduce evidence that the messages were sexually explicit and that they set in motion unsettling events in the life of the child who wrote them, we determine whether the trial court's exclusion of the specific language of those messages constituted an abuse of discretion.

■ Defendant argues that evidence demonstrating the content of the instant messages is essential to his assertion that when C.A. accused him of sexual abuse, she had a strong motive to lie. In fact, the trial record demonstrates defendant's full opportunity to develop this defense through the testimony of C.A.'s mother,

---

prior false allegation of sexual assault. This Court has recognized that an earlier false allegation involving sexual abuse may, "in limited circumstances and under very strict controls," be admissible under a narrow exception to *N.J.R.E.* 608, which ordinarily excludes evidence of specific instances of conduct to prove untruthfulness as a character trait. *State v. Guenther,* 181 *N.J.* 129, 154–56, 854 A.2d 308 (2004). C.A. made no prior allegation of sexual abuse before accusing defendant, and accordingly *Guenther* does not apply.

4 Defendant does not contend that the exceptions to *N.J.S.A.* 2C:14–7—that the evidence is "material to proving the source of semen, pregnancy or disease," *N.J.S.A.* 2C:14–7(c), or relevant to a defense of consent, *N.J.S.A.* 2C:14–7(d)— apply here.

her teacher and her guidance counselor. C.A.'s teacher testified that she was told that C.A. engaged in sexually explicit conversations with seventeen men. Defendant established before the jury that C.A.'s sexually explicit correspondence with these men was discovered by her mother. He showed that C.A.'s father swiftly arrived in New Jersey pressing for C.A.'s immediate move to Indiana, and that C.A. was isolated from school and friends as her worried parents confronted her at home for two days. Defendant demonstrated that at the moment when she accused him of sexual abuse, C.A. was the dejected subject of a parent-teacher meeting regarding her behavior and a potential move to a different state. Defense counsel used the instant messages to cross-examine C.A.'s mother and teachers, pressing the argument that C.A.'s accusations were not spontaneous, but prompted by her guidance counselor's leading questions.

Within the parameters of the trial court's ruling on the instant messages, defendant's fabrication defense was further developed in the testimony of C.A., a high school sophomore at the time of trial. Defense counsel asked C.A. about six individuals with whom C.A. had communicated over the internet. These men were identified by their screen names, several of which contained clear sexual overtones. On cross examination, C.A. stated that she initiated each of these conversations over a three-day period, and that she had learned the sexual phrases on the internet. C.A. stated that her "explicit" conversations prompted her mother to yell at her, her father to advocate a move to Indiana, and her parents and teachers to discuss her behavior in a lengthy meeting that she found uncomfortable and embarrassing. She testified that she initially told her mother she wrote the instant messages to get attention, but conceded that this reason did not appease her teacher who continued to press C.A. about why she had engaged in these adult, explicit conversations. C.A. acknowledged that she raised the sexual abuse allegations only in response to a question posed by her teachers. She admitted that if that question had not been asked, she would not have revealed the abuse, because she had "just pushed it aside." The court's ruling thus afforded to

defendant a thorough opportunity to prove that C.A. had fabricated her allegations to evade the consequences of her own serious misconduct.

In contrast, the specific content of C.A.'s instant messages is at best minimally relevant to defendant's effort to demonstrate the child's motive to lie. In accordance with the trial court's ruling, while the messages were not disclosed to the jury, they were accurately characterized as "explicit" several times during the trial. The messages contained no reference to defendant or to C.A.'s allegations against him. They do not address the subject of child sexual abuse; indeed, in writing them, C.A. attempted to portray herself as an adult.

The testimony permitted by the trial court unmistakably established that C.A. implicated defendant in the midst of a confrontation with her parents and teachers that was unprecedented in her young life. The testimony further explored defendant's allegation that C.A.'s mother, motivated by bitterness over the end of her relationship with defendant, together with her teachers who hoped to avert her move to Indiana, guided C.A. toward her accusations of sexual abuse. The gravity of C.A.'s personal and family situation in the hours and days following the discovery of her messages—at the heart of defendant's fabrication defense—was comprehensively presented to the jury.

██ Defendant offers a second rationale for his contention that the instant messages are relevant and necessary to a fair trial. He contends that certain of the instant messages demonstrate C.A.'s capacity to concoct fictional accounts of sexual activity, and thus support his contention that she fabricated her allegations of sexual abuse. That contention ignores the substance of the messages themselves. In contrast to C.A.'s detailed testimony at trial, the instant messages contain nothing remotely resembling a coherent narrative. Moreover, to the extent that they were offered as examples of past conduct to demonstrate the character trait of untruthfulness, the messages would be barred under *N.J.R.E.* 608. Absent evidence that the witness was convicted of a

crime, *N.J.R.E.* 608(a) provides that "a trait of character cannot be proved by specific instances of conduct." *See also Fitzgerald v. Stanley Roberts, Inc.*, 186 *N.J.* 286, 313, 895 *A.2d* 405 (2006); *State v. Guenther*, 181 *N.J.* 129, 143, 854 *A.2d* 308 (2004). The instant messages are not admissible to prove that this victim had a propensity for invention.

 Finally, defendant asserts that the trial court abused its discretion by declining to permit him to use the content of the messages to impeach C.A. at trial about her original allegation that defendant "fingered" her. That allegation was made when C.A., then twelve, first accused defendant of sexual abuse. C.A. later recanted her allegation of "fingering." At trial she attributed her mistaken use of that term to her young age, testifying that "because when I was little, you know, you hear things and that's just what I assumed what it was." Defendant contends that because they demonstrate C.A.'s sexual awareness at the age of twelve, some of C.A.'s instant messages are relevant to the jury's evaluation of the credibility of her explanation. However, the instant messages do not discuss the term "fingering," or demonstrate C.A.'s comprehension of the meaning of that term when she wrote her instant messages. C.A.'s original allegation of "fingering"—and her retraction of that statement—were thoroughly explored before the jury. The content of the instant messages would have contributed nothing to that inquiry.

 Application of the second prong of the test of *Budis* and *Garron*—a fact-specific comparison of the probative value and prejudicial effect of the disputed evidence—supports the trial court's application of *N.J.S.A.* 2C:14–7. Given the admission of evidence about the sexually explicit nature of C.A.'s instant messages and the dire consequences of their discovery, any probative value accorded to this evidence would be negligible. The trial court's conclusion that the impact of the messages' word-for-word content would be severely prejudicial is entitled to deference. A ruling permitting detailed questioning about the language of the messages could have a profound and permanent impact on a

sixteen-year-old victim, invading her privacy and subjecting her to a humiliating experience without advancing the truth-seeking purpose of a trial. Such a ruling would divert the attention of the jury from the crimes alleged. It would effect considerable prejudice in this case without any corresponding benefit because the contested evidence is of minimal probative value.

The specter of prejudice takes yet another form in this setting: the chilling effect a trial inquiry would have upon victims of child sexual abuse. In an age when children routinely converse with adults and peers on the internet—often against their parents' instructions, and sometimes at their peril—the prospect of a recitation of electronic messages in the presence of parents and strangers could deter a minor from coming forward and reporting this serious crime. An abuser aware of a child victim's internet activity could exploit that knowledge to perpetuate the abuse and forestall prosecution. While the admission of internet communications can in some cases be crucial to ensure a fair trial, trial courts should consider the impact of such evidence on the willingness of the victims of sexual abuse to testify. Here, the trial court determined that any probative value of this evidence was significantly outweighed by its prejudice. That finding is not so wide of the mark that it calls for our intervention. Consistent with the Legislature's objective in enacting *N.J.S.A.* 2C:14–7, and this Court's analysis in *Budis* and *Garron,* the trial court properly excluded the evidence.

## VII.

The trial court ensured to defendant a full opportunity to develop his defense of fabrication at trial, as it afforded essential protection to the child at the center of this case. The admission into evidence of material information about C.A.'s instant message communications with adults, but not the substance of the messages themselves, was a proper application of *N.J.S.A.* 2C:14–7 and our case law. Accordingly, we affirm the judgment of the Appellate Division.

*For Affirmance*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, and JUDGE WEFING (temporarily assigned)—6.

*Opposed*—None.