**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3700-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

IRVING FRYAR, a/k/a IRVING D.
FRYAR, SMURF FRYAR,

    Defendant-Appellant.

_____

Argued May 22, 2018 — Decided June 27, 2018

Before Judges Yannotti, Mawla and DeAlmeida.

On appeal from Superior Court of New Jersey,
Law Division, Burlington County, Indictment
No. 13-10-0197.

Lauren S. Michaels, Assistant Deputy Public
Defender, argued the cause for appellant
(Joseph E. Krakora, Public Defender, attorney;
Lauren S. Michaels, of counsel and on the
briefs).

Sarah Lichter, Deputy Attorney General, argued
the cause for respondent (Gurbir S. Grewal,
Attorney General, attorney; Sarah Lichter, of
counsel and on the brief).

PER CURIAM

Defendant Irving Fryar and his mother Allene McGhee were charged with second-degree conspiracy to commit theft by deception, N.J.S.A. 2C:5-2, N.J.S.A. 2C:20-4(a); and second-degree theft by deception, N.J.S.A. 2C:20-4(a). Defendant and McGhee were tried before a jury and found guilty on both counts. After denying defendant's motion for a new trial, the trial judge sentenced him to a five-year term of imprisonment and ordered him to pay restitution of $616,617.27. Defendant appeals from the judgment of conviction dated December 9, 2015. We affirm.

I.

We briefly summarize the testimony presented at trial. William Barksdale was the owner of several businesses, including Barksdale Business Group (BBG), Barksdale Loan Consultants (BLC), and Barksdale Investment Properties (BIP). Barksdale explained that BBG processed mortgage loans, and BLC was a mortgage company. BIP owned rental properties and also purchased, rehabilitated and sold properties.

While he was visiting Florida, Barksdale learned about mortgage schemes involving multiple home equity lines of credit (HELOCs). Barksdale explained how such schemes work:

> If you have a property, let's say it's worth $300,000, and you have a first mortgage of [$]100,000, you have approximately $200,000 difference between the price of the house, [the] current value and [the] first mortgage.

And you can borrow up to [eighty] percent of the actual equity of the house. If you have $200,000 equity, at [eighty] percent you can take loans out for $160,000. But with the multiple lines of credit, it takes usually [sixty] to [ninety] days for the liens to be recorded at the courthouse. If you apply for more than one loan at the same time, it won't hit the courthouse and be recorded so you can retain multiple lines of credits [and] instead of having one loan for 160,000, you can get five loans for like 800,000. It [gives] [you] more buying power[] to buy or flip properties or use at your discretion.

Barksdale stated that the same property is used as security for all of the loans. He said a person carrying out this scheme has to close on the transactions "in a short amount of time before one bank finds out about another bank" because, otherwise, the banks will not approve the loans.

Barksdale further testified that he first met defendant at a closing when Barksdale purchased a home in Burlington from defendant's corporation. McGhee had been living in the home and she needed a place to reside. At the time, Barksdale was in the process of rehabilitating a home on Glenview Lane in Willingboro. Barksdale sold the Glenview Lane property to McGhee, and BBG retained a lien on the property in the amount of $144,000.

In 2009, Barksdale and defendant began operating a fitness camp in Willingboro and Burlington. Barksdale ran the camp, and defendant would visit several times each week to work out and meet

persons at the camp. At some point, defendant approached Barksdale and asked him if he could get him about $500,000. They had a conversation about participating together in a HELOC scheme.

Barksdale explained to defendant how a HELOC scheme works. He said multiple lines of credit had to be acquired within a short time, so that the banks would not be aware that there were other loans secured by the same property. Barksdale also said "the money had to be paid back quickly."

Barksdale and defendant spoke about defendant's primary residence, which was in Springfield. Defendant told Barksdale a loan payment had not been processed, and the home had gone into foreclosure. Barksdale helped defendant in having McGhee purchase the Springfield property, and he assisted McGhee in applying for the loan to make the purchase. Barksdale said defendant needed money to pay back several investors and make the down payment on the Springfield home. Defendant told Barksdale he was interested in pursuing the HELOC scheme.

Barksdale and defendant discussed the property that would be used in the HELOC scheme, and they decided to use McGhee's property on Glenview Lane in Willingboro. Barksdale testified that McGhee "had good credit and could qualify for the loans." McGhee's involvement was important because she owned the home, had good credit, and needed to sign the documents.

Barksdale selected the six banks for the HELOC scheme and he discussed his selections with defendant. Barksdale chose banks that made loans to him in the past. Barksdale and defendant explained the HELOC scheme to McGhee. They told McGhee to use defendant's phone number on her loan applications, should any questions arise. Barksdale also overheard a phone conversation during which defendant told McGhee "to do what was needed to get the loans completed."

With the HELOC applications, McGhee submitted a W-2 form from 2008 and pay stubs from 2009, which identified New Jerusalem House of God (NJHOG) as her employer. At the time, defendant was a pastor at NJHOG. McGhee's W-2 stated that she had income of $87,532.16 in 2008. However, an accountant whose firm had provided services to NJHOG testified that NJHOG did not have employees in 2008.

Between November 2009 and January 2010, McGhee applied for and was granted HELOC loans at six different banks, using the Glenview Lane property as collateral for all of the loans. The Bank, Cornerstone Bank, Sun Bank, Susquehanna Bank, Beneficial Bank, and Roma Bank issued HELOC loans to McGhee. Barksdale did not sign any of the loan documents, but he drove McGhee to three of the closings, and went into the banks with her for two of the closings. All six loans closed, and McGhee obtained a total amount of $616,617.27.

All six banks issued payoff checks in the amount of about $130,000 to BBG to satisfy the existing mortgage on the Glenview Lane property. Barksdale deposited these checks, which totaled about $800,000, in BBG's account. He explained that defendant had the discretion to control the use of all the funds in the account except for the amount needed to pay off the existing mortgage on the Glenview Lane property.

Barksdale said that before the HELOCs closed, he issued at defendant's direction, six $20,000 checks to Jerry Hostetter, who was one of defendant's business partners. Defendant told Barksdale that after the HELOCs closed, he should take the $120,000 Barksdale advanced to Hostetter from the monies obtained in the HELOC scheme.

Defendant also directed Barksdale to use $106,000 from the HELOCs to pay Duane Ortega, who had advanced funds to defendant for the down payment for the purchase of the property in Springfield. Barksdale also disbursed monies from the HELOCS directly to defendant. Other monies from the HELOCS were deposited in joint bank accounts held by McGhee and defendant, and defendant withdrew funds from those accounts.

Barksdale testified that at the time of trial, he was serving a prison sentence. He explained that in December 2011, he pleaded guilty in federal court to conspiracy to commit wire fraud. As part of his plea, Barksdale admitted that he had conspired with

McGhee in the HELOC scheme involved in this case. He also admitted he had advised and assisted McGhee in carrying out that scheme.

Barksdale entered into a cooperation agreement with federal prosecutors, which required that he tell the truth and cooperate with federal and state authorities. Barksdale stated that he had received an eighteen-month reduction in his prison sentence as a result of his cooperation. The federal court ultimately sentenced Barksdale to twenty months in jail.

Barksdale testified in this case on July 29, 2015. He said he was due to be released on December 15, 2015, but he could be released sometime between August and October 2015, because he had earned "good time" credits. Barksdale said he did not have a cooperation agreement with the State, but he could benefit from testifying for the State in this matter.

Barksdale also stated he was under the impression the State's prosecutor would write to the federal authorities and indicate he had been cooperative. Barksdale said if such a letter was sent, he might be released from jail "within a month or so." He stated, however, that there was no guarantee he would be released early. That was up to the judge in the federal court. Barksdale said he had no written agreement with the State, and the federal cooperation agreement only required that he "tell the truth."

The State also presented testimony from persons at the six banks who issued the HELOC loans. The State also presented the HELOC loan documents and other bank records. Defendant and McGhee did not testify at trial.

In his closing statement, defendant's attorney argued that the State had not presented sufficient evidence to show defendant participated in the HELOC scheme. He said there was no evidence defendant knew about or presented McGhee's false W-2 statement to the banks with the HELOC applications.

Defendant's attorney also asserted defendant did not sign any of the documents related to the HELOC scheme. He did not attend the closings, and did not receive any checks from the loan closings. Defendant's attorney attacked Barksdale's credibility, and said the jury should not believe anything Barksdale said.

The jury found defendant and McGhee guilty of both charges. Defendant appeals and raises the following arguments:

> POINT I
> THE TRIAL JUDGE'S REFUSAL TO ALLOW DEFENSE COUNSEL TO CROSS-EXAMINE ALLEGED UNINDICTED CO-CONSPIRATOR WILLIAM BARKSDALE, THE STATE'S STAR WITNESS, REGARDING THE SPURIOUS CLAIMS HE MADE AGAINST [McGHEE'S] ATTORNEY IN AN ATTEMPT TO REDUCE HIS FEDERAL SENTENCE AND/OR OBTAIN AN EARLIER RELEASE, VIOLATED DEFENDANT'S RIGHTS TO CONFRONTATION, DUE PROCESS OF LAW AND A FAIR TRIAL.
>
> . . . .

POINT II

THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY
IT COULD USE BARKSDALE'S PRIOR INCONSISTENT
STATEMENTS — WHICH LARGELY EXCULPATED FRYAR —
AS SUBSTANTIVE EVIDENCE WAS REVERSIBLE ERROR.
(Not Raised Below).

POINT III

FRYAR WAS DENIED A FAIR TRIAL WHEN THE
PROSECUTOR IMPROPERLY VOUCHED FOR AND
BOLSTERED BARKSDALE'S CREDIBILITY BY TELLING
THE JURY IN SUMMATION THAT HE HAD NO
COOPERATION AGREEMENT WITH [THE] STATE AND
ONLY "A VAGUE HOPE THAT MAYBE SOME DAY
POSSIBLY HE MIGHT GET OUT SLIGHTLY EARLIER,"
DESPITE HIS KNOWLEDGE THAT BARKSDALE HAD GONE
SO FAR AS TO FALSELY ACCUSE [McGHEE'S]
ATTORNEY OF MISCONDUCT IN THE HOPES OF FURTEHR
REDUCING HIS SENTENCE. (Not Raised Below).

POINT IV

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED
ERRORS DENIED FRYAR A FAIR TRIAL. (Not Raised
Below).

II.

Defendant first argues that the trial judge erred by refusing to allow his attorney to cross-examine Barksdale regarding certain "claims" he allegedly made against McGhee's attorney Mark Fury prior to trial. Defendant contends the judge's ruling denied him his constitutional rights to confrontation, due process, and a fair trial. We disagree.

The record reveals the following. Prior to the start of defendant's trial, the prosecutors learned that Fury had communicated with Barksdale in a series of text messages. In one

9                                                                      A-3700-15T4

of those messages, Fury stated that he would be "coming after" Barksdale. Because Barksdale claimed he had known Fury for approximately five years and Barksdale believed the texts were threatening, the State filed a motion to disqualify Fury from representing McGhee at trial.

The trial judge denied the motion, finding that Fury's personal relationship with Barksdale did not create a conflict of interest sufficient to disqualify Fury from representing McGhee. In her decision, the judge also stated that the content of the messages was not relevant to whether Fury had a personal relationship with Barksdale, but nevertheless found that the alleged threats were not credible.

Later, during the trial, Barksdale testified for the State about his relationships with defendant and McGhee and his involvement in the HELOC scheme. When he cross-examined Barksdale, defendant's attorney sought to question Barksdale about the text messages he sent to Fury and the false statements Barksdale allegedly made about the texts. The judge ruled that the defense could not use specific instances of conduct for the purposes of impeaching Barksdale's character for truthfulness.

On appeal, defendant argues that if defense counsel had been permitted to question Barksdale about the messages sent to Fury, he would have been able to show that Barksdale hoped to benefit

10

from his cooperation with the State by making baseless charges against Fury. Defendant argues his attorney "could have show[n] that [Barksdale's] bias and motivation were so strong that [Barksdale] . . . lie[d] when he fabricated allegations against [McGhee's] attorney."

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2000) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). We will "not substitute [our] own judgment for that of the trial court, unless 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.'" State v. J.A.C., 210 N.J. 281, 295 (2012).

The Sixth Amendment to the Constitution of the United States and Article I, Paragraph 10 of the New Jersey Constitution guarantee an accused in a criminal case the right to confront adverse witnesses. State v. Guenther, 181 N.J. 129, 147 (2004). "A defendant's right to confrontation is exercised through cross-examination, which is recognized as the most effective means of testing the State's evidence and ensuring its reliability." Ibid. (citations omitted).

The Confrontation Clause was not, however, "intended to sweep aside all evidence rules regulating the manner in which a witness

is impeached with regard to general credibility." Id. at 150 (citing Davis v. Alaska, 415 U.S. 308, 321 (1974)) (Stewart, J., concurring). In this case, the trial judge properly applied N.J.R.E. 405(a) and N.J.R.E. 608 in limiting defendant's attorney from questioning Barksdale about his communications with Fury.

N.J.R.E. 405(a) provides that, "[w]hen evidence of character or a trait of character of a person is admissible, it may be proved by evidence of reputation, evidence in the form of opinion, or evidence of conviction of a crime which tends to prove the trait." N.J.R.E. 405(a) states, however, that "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible."

Furthermore, N.J.R.E. 608 governs the admission of character evidence for truthfulness or untruthfulness. The rule states that:

> (a) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness, and provided further that evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise. Except as otherwise provided by Rule 609[1] and by paragraph (b)

---

[1] N.J.R.E. 609 provides that, "[f]or the purpose of affecting the credibility of any witness, the witness' conviction of a crime shall be admitted unless excluded by the judge as remote or for other causes."

of this rule, <u>a trait of character cannot be proved by specific instances of conduct</u>.

(b) The credibility of a witness in a criminal case may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if the judge preliminarily determines, by a hearing pursuant to Rule 104(a), that the witness knowingly made the prior false accusation.

[(emphasis added).]

Our evidence rules "bar 'the use of prior instances of conduct to attack the credibility of a witness for two essential reasons: to prevent unfairness to the witness and to avoid confusion of the issues before the jury.'" <u>State v. Scott</u>, 229 N.J. 469, 498 (2017) (quoting <u>Guenther</u>, 181 N.J. at 141 (2004)) (Albin, J., concurring). Furthermore, N.J.R.E. 608 "was designed to prevent unfair foraging into the witness's past" and to prevent "wide-ranging collateral attacks on the general credibility of a witness [that] would cause confusion of the true issues in the case." <u>Guenther</u>, 181 N.J. at 141-42.

Here, the trial judge determined that by seeking to question Barksdale about the messages Barksdale sent to Fury and his alleged false statements about them, defendant's attorney was seeking to attack Barksdale's character for untruthfulness by showing specific instances of conduct. The judge correctly determined that N.J.R.E. 405(a) and N.J.R.E. 608 precluded that line of inquiry.

Furthermore, the application of our evidence rules did not unfairly limit the defense from confronting Barksdale's credibility. Indeed, the record shows that defendant's attorney questioned Barksdale extensively about his cooperation agreement with the federal government, which allegedly showed that Barksdale had a motive to lie about defendant's involvement in the HELOC scheme.

Defendant's attorney also questioned Barksdale extensively about his relationship with defendant, and sought to show the evidence did not support Barksdale's claim that defendant was the key participant in the HELOC scheme. Simply put, at trial, defendant had ample opportunity to confront Barksdale and challenge his credibility.

Defendant also argues that the trial judge's ruling was erroneous because it precluded him from showing that Barksdale was biased. "The Confrontation Clause permits a defendant to explore, in cross-examination, a prosecution witness's alleged bias." State v. Bass, 224 N.J. 285, 301 (2016).

Bias has been defined as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." Scott, 229 N.J. at 482 (quoting United States v. Abel, 469 U.S. 45, 47 (1984)). Nevertheless, a defendant's right to confrontation

"do[es] not entitle counsel 'to roam at will under the guise of impeaching the witness.'" <u>Bass</u>, 224 N.J. at 302 (quoting <u>State v. Pontery</u>, 19 N.J. 457, 473 (1955)).

Here, Barksdale's text messages to Fury and his alleged false statements about them were not probative of bias against defendant. Barksdale's messages and statements had no bearing upon the offenses for which defendant was charged or any bearing upon Barksdale's relationship with defendant.

The messages and statements also did not create an inference that Barksdale would be inclined to slant his testimony against defendant or McGhee. Indeed, as the trial judge stated:

> [t]he only reason for questioning Mr. Barksdale regarding the texts would be in essence to demonstrate to the jury that he is a liar based on specific instances of conduct. To show that because he lied about the texts he probably also lied in his testimony is exactly the type of evidence that is barred by [N.J.R.E.] 405 and 608. Here, there is not a prior conviction related to [the] text messages and the character trait [for] [untruthfulness] is not an essential element of the charged claim or defense.

We are convinced the judge's decision to preclude defendant's attorney from questioning Barksdale about the text messages was not a mistaken exercise of discretion. The judge's ruling was consistent with the applicable rules of evidence, and did not deny

defendant of his rights to confront Barksdale, due process, or a fair trial.

III.

Next, defendant argues the trial judge erred by failing to instruct the jury it could consider prior inconsistent statements by witnesses as substantive evidence. Defendant did not, however, raise this objection to the jury instructions at trial. We therefore must determine whether the absence of the instruction was plain error.

Generally, "an appellate court will not disturb a jury's verdict based on a trial court's instructional error 'where the charge, considered as a whole, adequately conveys the law and is unlikely to confuse or mislead the jury, even though part of the charge, standing alone, might be incorrect.'" <u>Wade v. Kessler Inst.</u>, 172 N.J. 327, 341 (2002) (quoting <u>Fischer v. Canario</u>, 143 N.J. 235, 254 (1996)). The focus is upon whether the instructions are capable of producing an unjust result or prejudicing substantial rights. <u>Fisch v. Bellshot</u>, 135 N.J. 374, 392 (1994).

On appeal, defendant argues that at trial, Barksdale minimized his involvement in the HELOC scheme and portrayed defendant as the mastermind of the scheme. He contends Barksdale's prior statements "told an altogether different story," which was much more favorable to the defense. He argues that the trial

16

judge's failure to charge the jury that it could consider Barksdale's prior inconsistent statements as substantive evidence deprived him of due process and a fair trial.

In her final instructions to the jury, the trial judge addressed prior inconsistent statements of witnesses. The judge stated:

> You have heard that, before this trial, witnesses made statements that may be different from their testimony in the trial. It is up to you to determine whether these statements were made and whether it was different from the witness' testimony in the trial.
>
> These earlier statements were brought to your attention only to help you decide whether to believe the witness' testimony here at trial. You cannot use it as proof of the truth of what a witness said in the earlier statement. You can only use it as one way of evaluating that witness' testimony in this trial.

The judge further explained that the jury could take into consideration "whether the witness made any inconsistent or contradictory statements" and "the possible bias, if any, in favor of the side for whom the witness testified." The judge did not, however, instruct the jury that a prior inconsistent statement "may be considered by [the jury] as substantive evidence of the prior contradictory statement or omitted statement." See Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (No Defendant)" (approved May 1994).

17                                              A-3700-15T4

When a trial judge fails to instruct the jury on the substantive use of a prior inconsistent statement, the question on appeal is whether the statement at issue relates solely to credibility, or whether the statement has value as substantive evidence bearing upon a disputed issue of fact. State v. Hammond, 338 N.J. Super. 330, 342-43 (App. Div. 2001). Here, defendant argues that the inconsistencies in Barksdale's testimony, if accepted by the jury as substantive evidence, would have made the jury less likely to find him guilty.

The record shows, however, that any inconsistencies in Barksdale's testimony related primarily to his credibility. At trial, Barksdale noted that he was testifying six years after the HELOC loan scheme was carried out, and he did not recall some details of the transactions. Moreover, any inconsistencies between Barksdale's trial testimony and his prior statements about the HELOC scheme did not directly contradict those parts of his testimony which detailed defendant's involvement in the scheme and the benefits defendant derived therefrom.

Defendant places great weight upon the fact that when he pleaded guilty to the federal charges, Barksdale did not mention defendant. However, this only showed that Barksdale did not identify defendant as a participant in the HELOC scheme when he pleaded guilty. The prior statement was relevant to whether

18 A-3700-15T4

Barksdale's trial testimony was credible, but it was not substantive evidence showing that defendant did not conspire to or participate in the HELOC scheme.

We therefore conclude that the absence of an instruction informing the jury that it could consider any prior inconsistent statement of a witness as substantive evidence did not constitute plain error. It was not an error "clearly capable of producing an unjust result." R. 2:10-2.

## IV.

Defendant further argues he was denied a fair trial because of certain comments the assistant prosecutor made in his summation. Defendant contends the prosecutor's comments require a new trial.

To warrant reversal of a conviction, "the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999) (quoting State v. Roach, 146 N.J. 208, 214 (1996)). In making this assessment, we "must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." State v. Frost, 158 N.J. 76, 83 (1999).

19

Where defense counsel fails to object to the challenged comments during summation, it "suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Id. at 84 (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997)). "The failure to object also deprives the court of an opportunity to take curative action." Ibid.

Under those circumstances, the comments should be deemed harmless, unless they were "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Bakka, 176 N.J. 533, 548 (2003) (quoting State v. Bankston, 63 N.J. 263, 273 (1973)).

In support of his argument, defendant cites the following comments by the assistant prosecutor:

> The fact is Mr. Barksdale doesn't have a strong incentive to cooperate with the State. There's no formal cooperating agreement. There has never been a formal cooperating agreement between the State and Mr. Barksdale. He has a vague hope that maybe some day possibly he might get out slightly earlier if he cooperates with the State. He could get out in August at the earliest. We're in August already. I would submit to you that he does not have a strong incentive to cooperate with the State.

Here, defendant argues that the assistant prosecutor improperly vouched for Barksdale's credibility. He also argues that the prosecutor bolstered Barksdale's testimony by suggesting

20

he no longer had an incentive to cooperate with the government at all.

As we have explained, on direct examination, Barksdale testified that he had a cooperation agreement with federal prosecutors. He testified that the agreement had already been taken into account when he was sentenced. Barksdale also stated that at the time of trial, he had no formal agreement with the State or the federal government, but it was his impression that if he cooperated in the prosecution of defendant and McGhee, his federal prison sentence might be shortened by "a month or so." Barksdale emphasized that this was "still up to the judge." He said his only obligation was to tell the truth.

During his closing argument, defendant's attorney argued that Barksdale was not a credible witness and the jury should not accept anything he said about defendant's involvement in the HELOC scheme. He stated, in pertinent part:

> Now, the State has not prosecuted [Barksdale], nor does the State have an[y] intention of prosecuting him. In fact, as you heard, the State wrote glowing comments to the federal judge who sentenced him. Which is one of the reasons, . . . that he got such a good deal.

Defendant's attorney also stated that the judge "has given you an instruction on how to weigh [the credibility of] somebody who pled guilty." Counsel stated that Barksdale was

21

"trying to sing for his supper. He's got skin in the game. He wants a good result here and he's willing to do anything for it."

We are convinced that the prosecutor's remarks were a reasonable response to defense counsel's closing argument. The prosecutor's statements were fair comment on the evidence. The evidence showed that Barksdale never had a formal written cooperation agreement with the State.

Moreover, the evidence supported the prosecutor's statement that Barksdale did "not have a strong incentive to cooperate with the State." Barksdale had a cooperation agreement with the federal prosecutors, but when he testified at defendant's trial, his cooperation could only result in a possible reduction of his federal sentence by "a month or so."

We therefore conclude the prosecutor's statements were not improper. Furthermore, because defendant's attorney did not object to the remarks when they were made, it must be presumed counsel did not view the remarks as prejudicial to the defense. Frost, 158 N.J. at 84 (citing Bauman, 298 N.J. Super. at 207). The prosecutor's remarks did not deny defendant of a fair trial or require reversal of his conviction.

## V.

Defendant argues that even if the individual errors complained of do not rise to the level of plain error, their

A-3700-15T4

cumulative impact warrants reversal of his conviction. We disagree.

The cumulative error doctrine provides that where a court's legal errors "are of such magnitude as to prejudice the defendant's rights or, in their aggregate have rendered the trial unfair," a new trial must be granted. State v. Orecchio, 16 N.J. 125, 129 (1954). However, even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014).

Here, the errors complained of did not deny defendant his right to a fair trial. As noted, the judge's omission of a portion of the instruction on prior inconsistent statements made by witnesses may have been erroneous, but it did not rise to the level of plain error. The other claimed errors were not prejudicial and did not deny defendant his right to a fair trial. We conclude the cumulative error doctrine does not apply in this case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3700-15T4