**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0374-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

IBILOLA IGHAMA-AMEGOR,

    Defendant-Appellant.

_____

Argued January 6, 2020 – Remanded January 31, 2020
Reargued October 26, 2020 – Decided November 20, 2020

Before Judges Sabatino, Gooden Brown, and DeAlmeida.[1]

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-06-0082.

Nicholas C. Harbist and Nicholas R. Tambone argued the cause for appellant (Blank Rome LLP, attorneys; Nicholas C. Harbist, Nicholas R. Tambone, Daniel R. Belzil, on the briefs).

---

[1] Two members of the original Part A panel were replaced in the new court term. Counsel were provided the opportunity to argue all issues before the reconstituted panel.

Regina M. Oberholzer argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Regina M. Oberholzer, Deputy Attorney General, of counsel and on the briefs).

PER CURIAM

This criminal prosecution arose out of an investigation that revealed rampant overbilling by a pediatrician. After a lengthy jury trial, defendant Ibilola Ighama-Amegor, M.D., was found guilty of forty-eight counts of the lesser-included offense of third-degree healthcare claims fraud, N.J.S.A. 2C:21-4.3(b), and one count of Medicaid fraud, N.J.S.A. 30:4D-17(b).[2] She was acquitted of a charge of theft by deception, N.J.S.A. 2C:20-4(a).

The court sentenced defendant to a three-year custodial term on the Medicaid fraud count and concurrent three-year sentences on the other counts. Defendants also was ordered to pay $216,000 in restitution.

Defendant presents the following arguments in her brief:

> POINT I
>
> THE TRIAL COURT'S SUA SPONTE DECISION TO INCLUDE A CHARGE ON RECKLESS HEALTHCARE FRAUD—WHICH HAD NOT BEEN CHARGED IN THE INDICTMENT, WAS NOT PART OF THE STATE'S IMPOSSIBLE DAY THEORY,

---

[2] As explained herein, the jury was instructed on the elements of N.J.S.A.30:4D-17(b), even though that count of the superseding indictment charged defendant with violating N.J.S.A. 30:4D-17(a) "and/or" N.J.S.A. 30:4D-17(b).

AND WAS NOT BORNE OUT BY THE TRIAL EVIDENCE—AFTER SUMMATIONS HAD ALREADY CONCLUDED, DEPRIVED DR. AMEGOR OF HER DUE PROCESS RIGHTS TO A FAIR TRIAL.

A. THE STATE'S CONSISTENT THEORY OF KNOWING HEALTHCARE FRAUD, AND THE COURT'S DECISION TO SUA SPONTE ISSUE A RECKLESS CHARGE.

1. THE TRIAL COURT ERRED WHEN IT SUA SPONTE ISSUED A RECKLESS HEALTHCARE FRAUD CHARGE AFTER SUMMATIONS HAD CONCLUDED.

2. THERE WAS NO RATIONAL BASIS FOR THE TRIAL COURT TO ISSUE THE LESSER-INCLUDED RECKLESS HEALTHCARE FRAUD CHARGE.

POINT II

THE TRIAL COURT ERRONEOUSLY EXCLUDED EVIDENCE REBUTTING THE "PHANTOM PATIENTS" AND OF DR. AMEGOR'S GOOD FAITH BELIEF THAT HER CODING WAS CORRECT.

A. DR. AMEGOR WAS DENIED A FAIR TRIAL BECAUSE THE TRIAL COURT EXCLUDED RELEVANT EVIDENCE OF DR. AMEGOR'S GOOD FAITH BELIEF THAT HER CODING WAS CORRECT.

B. DR. AMEGOR WAS DENIED A FAIR TRIAL BECAUSE THE STATE MISLED THE TRIAL COURT BY CONCEDING THAT IT WAS ABANDONING ITS "PHANTOM PATIENT"

A-0374-17T1

THEORY, THEN PROCEEDED TO ARGUE THE "PHANTOM PATIENT" THEORY DURING SUMMATION.

POINT III

THE JUDGMENT AS TO COUNT 49 MUST BE REVERSED BECAUSE THE TRIAL COURT GAVE A CONFUSING JURY CHARGE THAT CONFLATED TWO DIFFERENT TYPES OF CRIMINAL CONDUCT, ALONG WITH A CONFUSING VERDICT FORM, LEADING TO AN IMPLAUSIBLY INCONSISTENT VERDICT (NOT RAISED BELOW).

A.    THE TRIAL COURT'S JURY CHARGE AS TO COUNT 49 WAS ERRONEOUS BECAUSE IT CONFLATED SEVERAL SUBSECTIONS OF THE STATUTE, EACH OF WHICH CONSTITUTES DISTINCT CRIMES.

1.    STATUTORY LANGUAGE

2.    LANGUAGE IN COUNT 49 OF THE SUPERSEDING INDICTMENT

3.    LANGUAGE FROM THE TRIAL COURT'S JURY INSTRUCTION

B.    THE TRIAL COURT'S MISLEADING INSTRUCTIONS AS TO COUNT 49, COUPLED WITH THE COURT'S FAILURE TO ENSURE THE JURY REACHED A UNANIMOUS VERDICT, WAS PLAIN ERROR.

1.    THE TRIAL COURT'S FAILURE TO PROVIDE A "UNANIMITY" CHARGE TO

4

THE JURY SUA SPONTE, AS TO COUNT 49, WAS PLAIN ERROR.

2.    THE TRIAL COURT'S FAILURE TO PROVIDE A SPECIAL VERDICT FORM TO THE JURY WAS PLAIN ERROR.

C.    THE JURY'S VERDICT AS TO COUNT 49 WAS FATALLY INCONSISTENT WITH ITS VERDICT AS TO COUNTS 1 THROUGH 48, AND THIS INCONSISTENCY WAS COMPELLED BY THE TRIAL COURT'S ERRORS.

POINT IV

THE TRIAL COURT IMPOSED AN ILLEGAL SENTENCE BECAUSE IT IMPERMISSIBLY DOUBLE-COUNTED ELEMENTS OF THE CRIMES FOR WHICH DR. AMEGOR WAS CONVICTED AS AGGRAVATING FACTORS (NOT RAISED BELOW [ ]).

A.    THE TRIAL COURT ERRED BY FINDING THAT DR. AMEGOR BREACHED A PUBLIC TRUST SOLELY BECAUSE SHE IS A MEDICAL DOCTOR, BECAUSE HER STATUS AS A MEDICAL DOCTOR IS AN ELEMENT OF BOTH CRIMES FOR WHICH THE JURY CONVICTED HER.

B.    THE TRIAL COURT ERRED BY APPLYING AGGRAVATING FACTOR NUMBER 10, BECAUSE THE JURY CONVICTED DR. AMEGOR OF COUNT 49, A CRIME DIRECTED AGAINST THE STATE OF NEW JERSEY.

<u>POINT V</u>

THE TRIAL COURT IMPOSED AN ILLEGAL RESTITUTION AWARD (NOT RAISED BELOW [ ]).

Having considered these points in light of the record and the applicable law, we affirm defendant's convictions in all respects. We remand the matter with the State's consent, however, for reconsideration of the restitution amount and an ability-to-pay hearing.

I.

A.

We discuss the facts adduced at trial in considerable depth, as they will aid in analyzing the legal issues before us. By way of background, this case involves a Medicaid provider's use of two Current Procedural Terminology ("CPT") billing codes, 99354 and 99355. The codes are "add-on codes," used when a doctor provides "prolonged service involving direct face-to-face patient contact that is beyond the usual service in either the inpatient or outpatient setting." Code CPT 99354 signifies an additional hour of service, while CPT 99355 is for each additional half hour of service beyond that extra hour.

Several witnesses who took part in the investigation testified for the State to establish defendant's culpability. Among other things, the State witnesses testified that defendant had frequently misused these billing codes and

6

consequently had been overpaid for services. They established that defendant's use of the codes was unsubstantiated given the actual time she spent with individual patients, based upon her patient records.

DePaul

Jennifer DePaul, the director of the Special Investigations Unit for Anthem, formerly known as Amerigroup Corporation, a Medicaid service provider, explained the genesis of the investigation. At the time of the events, she was a senior investigator for Amerigroup and her duties were to investigate Medicaid fraud for the company.

DePaul "came across" defendant when the software she used for billing analysis found her practice had a "high level" of usage of CPT codes 99354 and 99355. Notably, defendant used those codes more than any other physician in New Jersey between 2006 and 2011. She explained that a policy change in 2010 required doctors to submit documentation supporting the use of those two codes; before then, no such supporting documents were required to be submitted, but had to be kept by the doctors.

DePaul requested medical records for sixty calendar dates from defendant's office to determine if her frequent use of the codes could be supported, but she received no response. A second request also received no

response. According to DePaul, defendant had been inquiring about why she had not been paid by Amerigroup for other claims, and "indicated she wouldn't give the files until she got paid for the work that she had been doing."

DePaul accordingly asked for and received permission from the State to investigate defendant. In August 2011, DePaul and another investigator went to defendant's office to request her records in person. After obtaining the records, a "certified professional coder" assisted in the review. From those records, DePaul calculated an overpayment on these particular accounts of $98,371. Defendant was sent an overpayment letter and was later terminated as a provider from the Amerigroup program.

Russo

Lucy Russo, supervising investigator for the State's Medicaid Fraud Division ("MFD") and a certified professional coder, received the request to investigate defendant from Amerigroup. In August 2011, Russo and another investigator met DePaul at defendant's office with a subpoena for a random sample of thirty claims. They conducted a medical record review, comparing the medical records to the claims that were billed.

Russo found that "[t]here was no accounting for the inordinate amount of time that [the billing showed] was spent with the patients." Russo noted, "there

8

was no time documented on the record. There was no reason that there would be that length of time spent with anyone and there was no documentation to support that." Russo concluded none of the records supported the services that were billed and that there had been an overpayment to defendant of $137,000.

Detective Parisi's Interview of Defendant

Laura Parisi, a detective with the Attorney General's Office, recorded an hour-and-a-half long interview with defendant on October 19, 2012, during the execution of a search warrant of her office. An edited version of that interview was played for the jury.

During the interview, defendant admitted that before March 2012, she had done her own billing. Defendant explained how she had billed for multiple patients seen in different rooms at the same time. Parisi told her that this way of billing was wrong.

Gilbreath

Linda Gilbreath was the manager of special investigations at Amerigroup in 2011 and a certified "coder." Her task in the investigation was to review the medical records obtained from defendant and validate the documentation compared to the services that were billed to Amerigroup. Gilbreath focused on

the CPT codes for "prolonged services," 99354 and 99355. Gilbreath found the "documentation did not support that prolonged services actually took place."

Gilbreath testified that prolonged services required "face-to-face time" with the patient in the same room. Concurrent billing—i.e., billing separately for three patients seen at the same time in the same room—was not allowed. As Gilbreath explained, a doctor with patients in different rooms at the same time should only bill for the face-to-face time that she actually spends with the individual patient and "what had been documented as rendered in her medical record." Gilbreath did acknowledge, however, that the term "face-to-face" is not defined in the CPT code books.

O'Brien

Elizabeth O'Brien, an analyst for the State's Medicaid Fraud Control Unit ("MFCU"), began an investigation of defendant in 2012. After running reports on claims submitted by defendant, O'Brien assigned times to segregate claims for which defendant received payment and for which she did not receive payment.

O'Brien specifically identified and investigated "impossible days," in which the time associated with CPT codes defendant billed for a single day totaled more than twenty-four hours. O'Brien found forty-eight "impossible

days" between 2008 and 2011. O'Brien created summary charts for each of the days broken down by single patient, the claim number, and the bills submitted. She testified in detail about her findings of overbilling.[3]

Mattis

Detective Kylie Mattis of the MFCU became involved in October 2012 in the criminal investigation of defendant's "excessive use of prolonged service codes." Detective Mattis was the team leader in the execution of the search warrant of defendant's office, in which 475 patient files were seized. The State investigators also seized appointment books and sign-in sheets to compare with the patient records.

Mattis testified at length about the patient records she examined in the investigation of the forty-eight impossible days. As one example, Mattis testified that for September 30, 2009, defendant submitted bills to the Medicaid program for seventy-five patients. Of those seventy-five patients, defendant submitted a bill for a 99354 code for fifty-one patients. In total, defendant's claims surmounted fifty-five hours for that one day. Mattis noted that defendant

---

[3] For example, on April 30, 2008, defendant billed for thirty-eight patients. Of those thirty-eight patients, defendant used the prolonged service code 99354 for twenty-eight patients, or about seventy-three percent. She used the 99355 code for two patients. Adding up the hours billed for that one day, O'Brien calculated that defendant billed for twenty-seven hours.

did not include the start and stop times of her patient treatment in any of her records.

Williams

B'leia Williams, a senior manager assistant in the MFCU, was asked to "run a data set of all of the procedure code 99354 claims that were billed by provider[s] [who were] participating in the managed care organizations" for April 1, 2008, through December 31, 2012. Her summary spreadsheet of the data request showed that defendant had the highest number of claims for that CPT code for all providers during that period.

B.

Defendant's Character/Patient Witnesses

Several character witnesses testified on defendant's behalf, giving testimony about her proficiency as a doctor and also her reputation in the community for truthfulness, trustworthiness, and veracity. After the first two character witnesses testified and numerous objections and sidebar conferences, defendant was required to take part in an N.J.R.E. 104 hearing with each new

witness to make sure the witness understood the limited scope of what he or she was permitted to testify about.[4]

Defendant had several parents and staff testify on her behalf as to their experiences with her as a pediatrician. Staff and other patient witnesses testified similarly, asserting that defendant would see multiple children at a time; that she spent long periods of time with each patient; that appointments lasted until late at night; that not everyone signed the sign-in sheet; and not everyone had an appointment. However, they also testified that defendant would spend more than an hour with each child, gave individualized care, was frequently available, and would stay until late in the evening.

As one example, a patient, S.A.,[5] testified that defendant had been her children's pediatrician since 2008. S.A. would normally bring her five children to see defendant in two groups, one with three children and one with two children. S.A. recalled that the least amount of time that defendant would spend

---

[4] In addition to requiring an N.J.R.E. 104 hearing before defendant called character witnesses, the court disallowed her from calling a number of other witnesses. The court did not permit patient testimony if the patient was not on the list of those seen on the forty-eight "impossible days," and found other character testimony to be either too cumulative or otherwise inappropriate.

[5] We use the non-party patients' initials, and those of their parents, to protect their privacy. R. 1:38-3(a).

with her children during an appointment was four hours. According to S.A., defendant would spend at least an hour-and-a-half with each child and she was sometimes in the office until 9:00 p.m. on those visits.

Another patient character witness, D.B., testified that defendant had been her four children's pediatrician for more than seventeen years. D.B. would take her children to defendant's office sometimes with an appointment and sometimes outside of office hours if there was an emergency. According to D.B., defendant was "available any time [they] needed her." As described by D.B., defendant would spend between one to three hours with the children; "she took time to give them individual attention and care." On some occasions, defendant would start a treatment with one of D.B.'s children and then leave the room and come back.

Staff Witnesses

Hanny Ogbebor, defendant's niece who worked in her office, testified that defendant was "always available to her patients." In addition to office hours, defendant made house calls and hospital visits, and was available by phone.

Ogbebor recounted that not everyone signed the sign-in sheet, and that patients also came in without having an appointment listed in the appointment book. Ogbebor agreed that "occasionally," defendant would attend to other

14

patients during a visit. For example, if one patient was being treated with oxygen, defendant would see other patients in another room.

M.J., one of defendant's secretaries in 2010, testified that she maintained the appointment book in defendant's office. M.J. stated that it was "often" that patients were not listed in the appointment book or did not sign the sign-in sheet. M.J. recalled that defendant came in on non-office days to see patients and she saw patients as early at 9:00 a.m. and as late as 10:00 p.m., sometimes.

M.J. described defendant's office as "neat" and "clean" and there was "always" a lot of patients in the office. M.J. also testified that defendant would often spend two to three hours with a patient, depending on the child or how many children were brought together; the shortest visit would be an hour with each child.

Defendant's Testimony

Defendant testified that she had been working as a pediatrician since 1986. She was trained in Nigeria and received the equivalent of an M.D. degree there. She came to the United States in 1988 and volunteered with a doctor at Harlem Hospital for a year and a half. In 1989, she took the exam to be licensed as a medical doctor in this country. Defendant then moved to New Jersey and did a

A-0374-17T1

three-year residency at the University of Medicine and Dentistry in Newark ("UMDNJ") from 1991 to 1994, focusing on pediatrics.

In 1994, defendant joined the staff at Children's Hospital in New Jersey. After the hospital went insolvent in 1997, she worked for the UMDNJ for a year and a half. She opened her own practice in 1998.

Defendant first began working with Medicaid patients in 1994 while working in the hospital. To do so, she had to apply to become a provider. Between 2008 and 2012, defendant was a provider for six or seven insurance companies. She claimed that, in 1998, she attended voluntary training on how to handle the coding aspect of her private practice and billing. She disputed earlier testimony that Medicaid had no record of her attending training.

Defendant testified that she attended a second training in 1999 after she received "a lot of denials" in order to get "more specific training" on codes and billing. She attended a third training in 2002 on coding, understanding her "remittance advice," and "how to properly bill Medicaid at the time."

Defendant first testified that there was no direction provided to her in training on the use of the prolonged services codes, but she later acknowledged that she was trained on the use of 99354 and 99355 as CPT companion codes. She testified that when she had difficulties with Medicaid billing, she contacted

16

Medicaid. She claimed that Medicaid suggested using the codes 99354 and 99355 and offered training on those codes, which she had attended in October 1999 and August 2002. Defendant claimed she did not understand what the term "face-to-face" meant in terms of the codes.

Defendant employed a nurse practitioner, who worked for her from 2006 to 2009 and treated patients. She also employed two successive physicians, one from 2010 to 2011, and another from 2011 to 2012. Both doctors treated patients and were overseen by her. She had four clerical employees who were also medical assistants that could assist with patient care. The office included three exam rooms, a private office, and an administrative office.

Defendant did her own billing "for the most part." However, she hired Igdorpolar Obisayou to take care of billing in March 2012, after her "encounters with the Medicaid Fraud Division" and to address her late billing.

Defendant testified that her patient population mostly had asthma, respiratory illness, allergies and skin problems. About eighty percent of the Medicaid recipients had "co-occurring morbidities."[6] During 2008 to 2012,

---

[6] The State successfully objected to defendant's many attempts to explain in depth the nature of her practice, what types of illnesses she treated, her interactions with patients and the time spent with each one. The court also sustained the State's objections and prevented defendant from testifying about

"close to 90 percent" of her patients were on Medicaid. "Almost everyone" required the use of a nebulizer during visits, and the time required for that treatment varied by age and temperament of the patients, ranging from fifteen to thirty minutes. Many patients would call defendant's cell phone if they needed urgent care and she would make arrangements to see them.

Defendant testified she had on occasion received a "bonus" for her recordkeeping after audits by insurance companies, and she had been found "one hundred percent compliant" with several categories of recordkeeping. However, on cross-examination, she agreed the bonuses were not for her recordkeeping but for providing services that prevented overuse of the emergency room.

Defendant recalled receiving a request for files from Amerigroup in 2010, which was unlike its normal audit protocol. Around the same time, defendant found that about two-thirds of her claims were not being paid by Amerigroup and she was unable to get a response through the usual channels. She was initially told that there was a problem with her provider number and they were not processing her claims, but she subsequently learned that the problem was

how she tried to explain her billing practices to the MFD. Defense counsel argued that this testimony should be permitted because "this is a crime of intention" but the court found that the communication was "not related to the prosecution for the improper billing, the illegal billing, that is claimed by the [S]tate."

18

her use of codes 99354 and 99355. Defendant testified that she was told that her use of the codes was "not appropriate" according to Amerigroup, but she had been using those codes the same way since 1998. She claimed that no other insurance companies told her she had issues with her use of the two codes.

When Amerigroup's representatives came to her office to retrieve files in 2011, defendant learned that the MFD was involved. They asked for files on sixty patients. She next received a notice from Medicaid that there would be a $154,000 levy on her account "because there was an insufficiency of data" to support the codes billed. Defendant sent a letter "with the standards that [she] had set up" to challenge the levy and explain her use of the codes.

Defendant met with Medicaid representatives in March 2012 to explain her understanding and use of the codes. Because defendant's records did not include a listing of "time in and time out," Medicaid did not accept defendant's explanation of how she estimated her time with patients. She claimed her training on the codes did not include any requirement that you had to document "face in and face out" on her record sheets, and she allegedly did not learn that until she met with the MFD.

Defendant acknowledged training did cover the requirement for "face-to-face" contact with the patient, but did not define what that term meant. From

her training, she believed that the term meant the total time she spent treating and examining the patient. She stated that the code book that was updated annually did not include any language about "the necessity of documenting literally the time you went in, the time you went out." She also claimed the book did not say anything about whether a doctor can go to another room and then return but it did say that the time did not have to be continuous. She stated that insurance companies other than Amerigroup did not "request" that she list the "time in and time out on the end of each report" even after they evaluated her records.

Defendant testified that, after she met with the MFD and learned that she had been "doing the billing wrong," she changed her practice "right away." According to defendant, she "made adjustments," hired a certified coder to do the billing, and did not submit a bill if she failed to note the patient's time in and time out. Defendant maintained that she did not "purposely mis-code" and that she was "providing the services," but she just did not know about the required documentation.

In addition to the levy from Medicaid, defendant received a letter from Amerigroup telling her that there were outstanding fees of $98,000 for "not using the code the way that is was supposed to be used." Defendant claimed

that she had not been paid by Amerigroup for about a year and that the company was not willing to talk to her about the monies owed to her. She signed a "corrective action plan" and Amerigroup later terminated her contract. Medicaid then sent her a notice that they were no longer pursuing the levy and defendant "thought it was over."

Defendant described what happened on October 19, 2012, the date when the search warrant was executed on her office. She testified that the investigators seized 478 files. They also seized defendant's training materials, computers, correspondence with Medicaid and Amerigroup, and a number of personal items including her tax documents, receipts for taxes, and checks.[7]

Defendant was taken that day into an exam room for a recorded interview with Detective Mattis. According to defendant, she first learned of the term "impossible days" during her interview.

During the course of defendant's trial testimony, she attempted to explain the forty-eight impossible days identified by the State, as well as alleged "errors" that she found in an exhibit prepared by the State. Defendant contended that

---

[7] Defendant has not challenged on appeal the validity of the search warrant and the related search.

investigators did not access the basement where she kept inactive patient files and files for some patients seen on the impossible days.

Defendant asserted that the claim paid dates "are mostly wrong," the Medicaid ID numbers were different than what she had in her records, the claim ID numbers were different, the amount paid was wrong and the CPT codes used and submitted were not consistent. She alleged similar kinds of errors on other dates, including patients on the list that were not her patients and patients on the list that had not been seen on the particular day.

Defendant calculated that twenty percent of the patients that she had been "given credit for" on a particular impossible day had not been seen that day. She said the State's documents failed to account for the doctors and nurse practitioner that she had working for her intermittently, including on some of the impossible days.

Defendant also noted that, for example, on the summary sheet for September 30, 2009, twenty-one of the seventy-five patients were "minimal service," meaning that they just needed a referral for another doctor or a medication refill that could have been handled by the nurse. She claimed the summaries also included patients that were not Medicaid patients. She admitted

on cross-examination, however, that she did not treat seventy-five patients on that one day but that some were billed on that date in error.

Defendant contended that she used "encounter forms" to document her interactions with each patient during a visit. She had created a three-page document for billing purposes, entitled "tested standard time spent on procedures, observations, and counseling in addition to the evaluation and management updated." That document was last updated in 2010. The document would list the time she would spend with each patient according to what she was treating that day and particular situations.

Defendant testified that she worked between twelve to eighteen hours a day in 2009, ten to twelve hours a day in 2010, and ten to fifteen hours a day in 2011. That did not include the work hours of the other doctor and nurse practitioner in her office.

Defendant admitted on cross-examination that when she listed thirty minutes for observing a patient's reaction to administration of antibiotics, she would not actually sit with the patient for the whole thirty minutes. In such instances, she would treat other patients in other rooms and go in and out of the room to check for reactions.

Defendant agreed that when other doctors or the nurse practitioner saw patients in her office, their notes would also have to be documented in each patient's file. She did not know, however, how many of the impossible days included notes from the others and she had not instructed the other doctors to document start and end times.

According to defendant, her staff maintained the appointment book and sign-in sheets, but she often saw patients not listed in the book or sheets. She used a clearinghouse for her billing, and later found that she had made some errors on the billing dates she listed in 2009 that were then used by Mattis in her reports.

Lastly, defendant disputed the State's contention that she made more than a million dollars a year through her billing practices. She first testified on direct examination that she earned $68,000 in 2008, $75,000 in both 2009 and 2010, $120,000 in 2011, and nothing in 2012. However, on cross-examination, she agreed that her business income from 2008 to 2012 totaled "about a million dollar [s]" and that she had earned $120,000 in 2009.

Verdict and Sentencing

As we previously noted, the jury found defendant guilty of forty-eight counts of reckless healthcare fraud, and one count of Medicaid fraud. The trial

judge, as mentioned, imposed a three-year custodial sentence, plus restitution. We were advised at oral argument that defendant has already served the sentence.

II.

The most significant issue raised by defendant, one which prompted a remand by this court to settle the record, concerns the trial court's instruction to the jury allowing them to consider whether the proofs supported third-degree "reckless" healthcare fraud as a lesser-included offense of second-degree "knowing" healthcare fraud.

Defendant contends her trial attorney was not informed in advance of the court's decision to charge this alternative to the more severe related offense before she made her closing argument. She further contends the court violated Rule 1:8-7(b) by not conducting on the record a charge conference about this particular instruction, and that the deviation from the Rule entitles her to a new trial. Aided by the trial court's findings on remand, we reject defendant's arguments for reversal.

### "Reckless" Healthcare Fraud as a Lesser-Included Offense of "Knowing" Healthcare Fraud

This is the pertinent background. Defendant was charged in the indictment with forty-eight counts of second-degree healthcare claims fraud

under N.J.S.A. 2C:21-4.3(a), which states: "A practitioner is guilty of a crime of the second degree if that person knowingly commits healthcare claims fraud in the course of providing professional services."  As an alternative to this more serious offense, N.J.S.A. 2C:21-4.3(b) states that it is a third-degree crime if a practitioner "recklessly commits healthcare claims fraud in the course of providing professional services."

The Criminal Code defines knowing conduct as follows:

> [I]f [the actor] is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence.  A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.  "Knowing," "with knowledge" or equivalent terms have the same meaning.
>
> [N.J.S.A. 2C:2-2(b)(2).]

By comparison, the Code defines reckless conduct as follows:

> [W]hen [the actor] consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.  "Recklessness," "with recklessness" or equivalent terms have the same meaning.
>
> [N.J.S.A. 2C:2-2(b)(3).]

26

Reckless healthcare claims fraud is a lesser-included offense of knowing healthcare claims fraud because it may be established by a lower level of culpability. N.J.S.A. 2C:1-8(d)(3); State v. Thomas, 187 N.J. 119, 129-30 (2006).

A trial court's decision to charge on a lesser-included offense is governed by N.J.S.A. 2C:1–8(e). Under that statute, the trial court should not charge a jury on "an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Ibid. (emphasis added). "[W]hether the lesser offense is strictly 'included' in the greater offense . . . is less important . . . than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser." State v. Cassady, 198 N.J. 165, 178 (2009) (alterations in original) (emphasis added) (quoting State v. Brent, 137 N.J. 107, 117 (1994)). Our courts have "long held that trial courts have an independent duty to sua sponte charge in a lesser-included offense" in situations where "the facts in evidence 'clearly indicate' the appropriateness of that charge." State v. Alexander, 233 N.J. 132, 143 (2018) (emphasis added) (quoting State v. Savage, 172 N.J. 374, 397 (2002)).

We are satisfied the trial court appropriately provided the jury with the lesser-included offense charge of reckless conduct in this case on counts one through forty-eight. There was a rational basis in the evidence to justify such a charge, given the nature of the proofs concerning defendant's billing practices and her disputed state of mind.

As we have described at length in Part I, the State presented substantial evidence as to the "impossible days," and defendant's practice of billing for more than twenty-four hours in a single day without producing sufficient documentation in the medical records to justify those billings. There was also sufficient evidence from which the jury could reasonably find that defendant's actions—i.e., billing for more time than she actually spent individually with patients, or for multiple patients at once, or for patients that could not be verified—was, if not knowing, then arguably reckless.

The State presented substantial evidence about defendant's billing practices that a jury could reasonably find were deliberately fraudulent or, at the very least, reckless. Among other things, those proofs included defendant's failure to maintain records, her submission of bills weeks or months after treatment, and her use of a chart to merely estimate the time she spent with a

patient depending upon the diagnosis or treatment rather than actually documenting the time spent with each patient.

Although defendant claimed she initially thought she was using the CPT codes correctly and could bill individually for patients she saw together, she had trouble explaining the extensive overbilling on the impossible days. She mentioned that she had a nurse and other doctors working for her at times, but did not produce them as witnesses or offer any specific evidence of their treatment of patients. Her wrongful conduct could be rationally viewed as either intentional or reckless.

Given these competing contentions and proofs, the trial court did not err in finding that there was a rational basis for charging the lesser-included offenses. The propriety of such a charge was "clearly indicated."

Issues Concerning Rule 1:8-7(b)

We next turn to defendant's arguments concerning Rule 1:8-7(b), in which she contends the court failed to conduct a charge conference before summations that might have aided her attorney in attempting to address the lesser-included offense of recklessness with the jury. She argues the trial court's decision to issue the lesser-included charge violated her due process rights to a fair trial because the State had pursued a theory that she had engaged in knowing

healthcare fraud and she defended herself against such a theory at trial. She further argues that the court violated Rule 1:8-7(b), which requires a charge conference to be held on the record in criminal cases prior to summations.

In this regard, Rule 1:8-7(b) provides:

> Prior to closing arguments, the court shall hold a charge conference on the record in all criminal cases. The parties shall, if directed by the court, make requests to charge in a format suitable for ready preparation and submission to the jury at a time directed by the court . . . . Whenever practicable, the court in advance of the charge conference shall provide counsel with a copy of its proposed jury charge for review, which copy shall be marked as a court exhibit. At the conference the court shall advise counsel of the offenses, defenses and other legal issues to be charged and shall rule on requests made by counsel. Objections to the instructions to the jury shall be in accordance with R. 1:7-2. Any party, at or before commencement of trial, may submit written requests that the court instruct the jury on the law as set forth in the requests. As to issues not anticipated prior to trial, any party may submit written requests before closing arguments.

This Rule serves the dual purpose of permitting counsel to conform their summations to the anticipated jury charge and also providing a suitable record for future appellate review. Pressler & Verniero, Current N.J. Court Rules, cmt. 3.1 on R. 1:8-7 (2021).

The subject of whether lesser-included offenses should be charged was raised by the State, not the court, during defendant's testimony and several days

before closing arguments. Although there apparently was no formal charge conference held on the record on this subject, the evidence shows that a draft charge and an amended charge containing the reckless language was distributed by the court prior to summations. Moreover, on the record before delivering her summation, defense counsel unequivocally accepted that proposed charge without objection.

The trial transcripts reflect that the court's final written jury instructions matched the instructions read to the jury. Twice before their issuance to the jury, the trial court noted that it had provided the charge to counsel and that the charge for the jurors was identical to that distributed charge. On both occasions, defendant raised no objection.

It was only after summations that defense counsel then claimed that she had just seen the lesser-included charge of recklessness because her computer was not working. Defendant argues that she was unfairly surprised by the inclusion of the lesser-included-offense language, and that the court deprived her of a fair opportunity to argue against the charge's inclusion and to tailor her closing argument accordingly.

Given the tenor of defendant's claim on appeal of unfair surprise, we remanded the issue to the trial court to settle the record before this appeal was reargued. The trial court thereafter duly conducted an evidentiary hearing on the subject on remand. We thereafter considered supplemental appellate briefs from the parties.

Defendant's trial attorney testified at the remand hearing. In the course of her testimony, the attorney recalled there were "charge conferences and conversations about jury instructions," but she did not specify whether they took place on or off the record.

Defense counsel did recall an off-the-record discussion with the judge and the prosecutor about the lesser-included charge before her summation, but she did not have a specific recollection of the discussion or the court's ruling. When asked to describe the computer problems she claimed to have experienced before her summation, she did not recall specifics, but stated that she had asked her IT people to look into it. She did acknowledge that "at some point" she did receive the revised jury charge containing the reckless language.

Defense counsel could not recall with clarity whether she knew about the inclusion of the lesser included charge before summations. However, she did

32

testify that, after summations, she felt it was "real important to reiterate [with] the judge that there was no reckless [offense] here, notwithstanding his opinion that it should be." Counsel said she was "surmising" that she actually knew that there had been a definitive ruling on the lesser included charge before her closing argument.

After hearing this testimony on remand, the trial judge made a number of significant factual findings that bear on our review of defendant's claims of procedural unfairness. The judge stated that he had conducted charge discussions that included the lesser included reckless offense, both "on and off the record." These discussions "conclud[ed] in a final charge conference on the record, at the bench, on May 16, 2017," the day before summations. The judge explained he brought the jury back first thing the next morning because both counsel stated that they had received the charge and were satisfied with it. As the judge found, "[t]hat same afternoon as the charge conference," the judge delivered to both counsel, "and they acknowledged receiving," hard copies of the final version of the charge, which was "substantially the same as the most recent prior version except for some housekeeping changes." The next morning, May 17, 2017, the judge again asked counsel on the record about the charge that had not been changed, and defense counsel responded: "That's fine, Judge."

33

The judge further determined on remand that his law clerk had indeed emailed the jury charge, including the reckless language, to counsel twice before the May 9 closing arguments: once on May 4 and again on May 8. This finding was corroborated by two emails made part of the record on remand. In attachments to both emails, the lesser-included reckless language was included.

As the judge found, "[t]he definitive decision" concerning the charges contents was given orally to counsel in an off the record discussion "on or about May 4, 2017," and in writing that same day through presentation of the charge. The judge determined the charge was sent by email on May 4, and was acknowledged by counsel on May 16, and again on May 17, just before summations.

As to defense counsel's assertion that she was "prone to computer problems," the judge noted he had received a response from the information technology ("IT") unit of the public defender's office that there were "no computer problems." The IT evidence showed that the law clerk's May 4, and May 8, 2017 emails were marked as "read," which meant they had been opened. However, the IT unit was not able to determine the date(s) when those messages were opened.

34

We owe substantial deference to the trial court's factual findings.  State v. Elders, 192 N.J. 224, 243 (2007); see also Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974).  We do not second-guess the judge's determination about the actual sequence of events, particularly because defense counsel failed to attest definitively in her remand testimony she had not been provided with the recklessness charge before her summation.

Defendant infers that her former counsel must have not received the charge ahead of time, because the attorney expressed surprise to the judge in voicing her objection to the recklessness language after delivering her summation.  But, given the opportunity on remand for further reflection, defense counsel at the hearing described this post-summation application as an attempt to "reiterate" her opposition to the charge, a word that implies she had indeed seen it (and opposed it) before.  Given this evidence and the court's factual findings, defendant's argument alleging unfair surprise is unavailing.

We next consider Rule 1:8-7(b) and the lack of a supplemental charge conference on the record, in which the pros and cons of recklessness charge could have been debated before the judge.  The State concedes the omission of such an on-the-record discussion is contrary to the Rule.  Even so, we do not regard the deviation from the Rule to create a per se right to a new trial because

of the omission. Our focus must be on whether defendant demonstrates she was substantially prejudiced by the departure from the Rule. R. 2:10-2 (requiring parties seeking relief on appeal to establish that alleged error was "clearly capable of producing an unjust result"). No such demonstration has been made here.

The judge's remand findings reflect that defense counsel was supplied with the reckless charge well before the closing argument, and that she assented to the charge on the record before proceeding with her summation.

We are mindful that neither the prosecutor nor the defense attorney mentioned recklessness in their closing arguments. But that lack of mention easily could have been a strategic choice by both sides, hoping for an "all-or-nothing" decision on the more severe charge of knowing fraud. Defense counsel could have logically shied away from speaking about recklessness and thereby reminding the jurors of a second way for the jurors to convict her client of something. The propriety of a lesser-included-offense jury charge is not dependent upon "the strategic decision[s] of counsel." Alexander, 233 N.J. at 143 (citations omitted). In addition, defendant has not proffered to us specific additional arguments that she would have made in summation to negate recklessness, apart from perhaps reiterating that her state of mind was not

culpable in any respect. The jury already was provided with that defense position in the closing argument that was presented.

In retrospect, it would surely have been preferable, as <u>Rule</u> 1:8-7(b) prescribes, for the recklessness charge to have been discussed in a conference with the judge on the record before summations. Even so, the <u>Rule</u> is not an automatic reversal mechanism. Defendant has cited no case supporting such an inflexible approach to appellate review. She has failed to demonstrate that she or her former attorney were substantially prejudiced by the omission. We therefore reject defendant's argument contending that reversible error occurred.

III.

Defendant's arguments regarding other alleged flaws in the jury charges are likewise unavailing. To be sure, we are mindful that, as a general principle, clear and correct jury instructions are essential to a defendant's right to a fair trial. <u>State v. Rodriguez</u>, 195 N.J. 165, 175 (2008). The instructions should spell out how the jury should apply the law to the facts of the case. <u>State v. Concepcion</u>, 111 N.J. 373, 379 (1988). Nonetheless, we must examine the charge "as a whole" in evaluating whether any alleged defect in the charge compels reversal on appeal. <u>State v. Torres</u>, 183 N.J. 554, 564 (2005).

None of the arguments presented by defendant concerning alleged flaws in the charge –which were not objected to by her trial counsel – are persuasive or rise to the level of plain error sufficient to set aside the jury verdict.  We discuss them briefly.

The judge's reference to "and/or" language in the indictment when describing the State's allegations, although theoretically problematic,[8] was of no consequence because the judge later provided the jury with correct descriptions of the applicable legal standards for each charged offense,

Despite a reference in the superseding indictment to both subsections (a) and (b) of N.J.S.A. 30:4D-17 in count forty-nine, the court appropriately charged the jury only under subsection (b)(1) of N.J.S.A. 30:4D-17 and not subsection (a) thereof.[9]  We discern no prejudice to defendant arising from the omission of subsection (a)—which calls for more severe sentencing by removing the

---

[8] See State v. Gonzalez, 444 N.J. Super. 62, 75-76 (App. Div. 2016) (criticizing the use of "and/or" as ambiguous).  However, in denying certification in Gonzalez, the Supreme Court instructed that "[t]he criticism of the use of 'and/or' is limited to the circumstances in which it was used in this case." State v. Gonzalez, 226 N.J. 209 (2016).  Hence, the inclusion of "and/or" terminology is not a per se basis for reversal.

[9] The judgment of conviction contains a clerical error in this regard and should be amended to reflect a conviction on subsection (b)(1) to correspond with the court's charge on count forty-nine.

presumption of non-incarceration. Nor do we discern any necessity in this case for the court to have issued a special charge on unanimity as to count forty-nine. In addition, the charges inadvertent inclusion of extraneous verbiage from N.J.S.A. 30:4D-17(b)(3)(ii) did not prejudice defendant, because that verbiage only increased the State's burden of proof with additional elements.

In a related argument, defendant contends the jury's findings of guilt on reckless healthcare claims fraud in counts one through forty-eight cannot be reconciled with the finding of guilt on count forty-nine of "knowing" and "willful" Medicaid fraud under N.J.S.A. 30:4D-17(b)(1). Despite that apparent dissonance, the law is clear that jury verdicts do not need to be consistent to be sustainable. State v. Muhammad, 182 N.J. 551, 578 (2005).

Courts are not permitted to "conjecture regarding the nature of the deliberations in the jury room," or "speculate whether verdicts resulted from the jury lenity, mistake, or compromise," nor do they "attempt to reconcile the counts on which the jury returned a verdict of guilty and not guilty." Ibid. Instead, courts "determine whether the evidence in the record was sufficient to support a conviction on any count on which the jury found the defendant guilty." Ibid.; accord State v. Goodwin, 224 N.J. 102, 116 (2016). Here, the evidence was sufficient for the jury to reach the determinations it made individually on

all forty-nine counts of fraud allegations. We do not presume the jurors were confused just because they appeared to judge defendant less harshly on the first forty-eight counts than they did on the forty-ninth.

IV.

We also are unpersuaded by defendant's various claims of evidentiary error. A judge's ruling to admit or exclude evidence typically "should be upheld 'absent a showing of an abuse of discretion, i.e. there has been clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). The judge's decision will generally not be disturbed on appeal unless it is proven to be "so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982); see also R. 2:10-2 (instructing that any errors or omissions by trial court's "shall be disregarded by the appellate court unless . . . of a nature is to have been clearly capable of producing an unjust result").

Defendant argues such reversible error occurred here with respect to: (1) the exclusion of certain proofs of her training on the use of CPT codes and billing practices; and (2) evidence to rebut a so-called "phantom patient" theory by the State. We detect no error on either of these points, and certainly not one

40

that equates to a manifest denial of justice, when the arguments are considered in an appropriate context.

Billing Code Training

As to the first subject concerning training proofs, the issue arose when the court sua sponte interrupted her testimony about training she had received in 1998, and stated it was "hospital training" and not "Medicaid training." The State had objected when defendant attempted to testify about how she was trained on the use of the two CPT codes in question and when she attempted to introduce an exhibit from that 1998 training she said she attended on "Coding for Pediatrics." Defendant sought to introduce that exhibit, D-45, a PowerPoint slide, in response to a State's witness who testified that defendant did not undergo any training. Defendant claimed she could not provide other evidence of training because the State had confiscated all of her training materials.

The State argued that it did not have anything "from Medicaid" and that it was not known where these materials came from because the listed speakers did not show a connection to Medicaid; defendant argued that it was a "credibility issue" for the jury to determine.

Thereafter, defendant again sought to testify that the exhibit was from a 1998 training she attended at the hospital where she worked at the time. It was

41

then that the court interrupted the testimony and, at a sidebar, stated that "[t]his clearly is not medical [sic] [meaning Medicaid] training. It's hospital training." Defendant asked for a hearing on the issue.

The court then conducted a voir dire as to the admissibility of the exhibit, outside of the presence of the jury. Defendant testified that she received the training materials from UMDNJ, and the training included how to use the "extended purposes distended services codes." Although the training was "sponsored" by the hospital, defendant could not recall if "anybody in [M]edicaid" participated. However, she testified that the other trainings she attended were Medicaid-sponsored training, but that the State had taken all of her materials and had not returned them. She claimed she had a phone record of her calling Medicaid to schedule one of the trainings they offered. Notably, defendant's attorney conceded that the 1998 training was "[c]learly" not offered by Medicaid but that it was "a training" on the use of those codes.

The court ruled that it was satisfied that "these are not documents that were supplied by [M]edicaid and the hospital may have made references then. So the hospital is not [M]edicaid and the [M]edicaid people provide their own training. So this'll not be the subject for discussion before the jury on the part of the defense."

A-0374-17T1

Even assuming, for the sake of discussion, the court's ruling to exclude further defense proofs about this training on the use of codes, including Exhibit D-45, could reasonably have been more permissive, we detect no abuse of discretion or manifest injustice stemming from the court's limitation. The one relevant slide within Exhibit D-45 dealing with prolonged physician services codes does <u>not</u> support defendant's claim that she could use those codes to bill for multiple patients at a time, as she testified she believed was allowed.

In particular, defendant contends the evidentiary limitation was inequitable because the State was allowed to cross-examine her about her training on CPT codes. But the record does show she was granted a fair amount of leeway to attempt to present her competing narrative, even if not the exhibit.

Defendant testified on direct examination about a number of trainings she attended. She was then cross-examined about the fact that Medicaid had no record of her attending any training. Defendant disputed that testimony and claimed that they should have records of her phone call to register and the sign-in sheets. On redirect, defendant testified again that she attended training on three occasions and she introduced a remittance from Medicaid showing the training schedule and the number to call to sign up for training. When asked if that was her only proof that she attended training, defendant responded by

saying that she attended training in the hospital in 1998 and that she went "to Melina" in 1999 and 2002. It was only after defense counsel asked if she had "other proofs" that the State objected and the objection was sustained. Defense counsel did not question defendant further on the issue.

Viewed in context, although the court did sustain a number of objections from the State on the issue of training, defendant was still able to testify on direct, cross, and redirect that she did attend at least three training sessions on Medicaid billing during her years in practice. There was no manifest injustice.

In sum, although defendant argues on appeal that the court erred in refusing to admit "highly probative evidence of [her] innocent state of mind," the exhibit from the hospital training that the court declined to admit does not support defendant's argument about what it signifies. Although Exhibit D-45 would have lent some support to defendant's claim that she attended at least one training on the use of CPT codes, it does not support her claims that her method of billing for multiple patients simultaneously was permitted. Moreover, defendant was able to testify as to her state of mind in the use of the codes, and tell the jury she had attended several training sessions over the years. The court did not clearly abuse its discretion in disallowing the training exhibit or in limiting the extent of the testimony about the exhibit.

"Phantom Patient" Rebuttal Proof

Defendant's other evidential argument is that she attempted to introduce testimony from multiple patients who were seen by her on the forty-eight impossible days, in an effort to rebut the State's so-called "phantom patient" theory. She claims that the court did not allow the testimony because it believed, and the State agreed, that the State was not contending that the patients in question did not exist. Nevertheless, defendant asserts that, during summation, the State argued she had submitted bills "for time and for services that did not happen" and there were a significant number of claims with no documentation to justify the bills. Defendant concedes that the State did say it was "not saying that these patients didn't exist," but she claims that "that is precisely what the State asked the jury to infer."

Placed in appropriate context, this likewise is not an issue that warrants a new trial. The State did not argue that the human beings identified in plaintiff's billings on the "impossible days" were imaginary. Instead, the State was arguing that those persons were not seen by defendant on the specific dates in question for the amounts of time reflected on the bills. Consequently, the court did not abuse its discretion in limiting certain testimony from individual patients to rebut a theory the State was not actually advancing. Again, defendant does not

A-0374-17T1

surmount the high bar for reversing a conviction based on a court's evidential ruling on admissibility. J.A.C., 210 N.J. at 295; R. 2:10-2.

## V.

The balance of defendant's arguments with respect to her conviction, to the extent we have not already commented on them, lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

## VI.

Lastly, we see no grounds to reverse the custodial sentence imposed by the court, which we were advised at oral argument defendant has now fully served. To the extent the duration of the sentence is not moot, we are unpersuaded to overturn the trial court's analysis and its balancing of the aggravating and mitigating factors. State v. Fuentes, 217 N.J. 57, 70 (2014). Even if, as defendant alleges, portions of the court's sentencing comments might be viewed as "double-counting" of aggravating factors, the overall sentence does not shock our conscience or represent a clear abuse of discretion. Ibid.

We are well aware that defendant had no previous criminal record, and that a number of her patients came forward to vouch for her competent professional care of their children as a pediatrician. Nonetheless, the strong public policies that underlie the Medicaid and healthcare fraud statutes, and the

need to deter violations, are also important. The sentencing judge was entitled to give these concerns strong offsetting consideration in calibrating the ultimate sentence.

As a final matter, the State concedes the amount of restitution must be reexamined on remand. Such a remand should explore defendant's financial ability to pay restitution, and also the actual quantity of the State's actual financial losses. State v. Harris, 70 N.J. 586, 593 (1976); see also N.J.S.A. 2C:43-3. We accordingly remand for such a hearing on the restitution amount.

VII.

Affirmed in all respects, except for a limited remand on the amount of restitution and a correction to the wording of the judgement of conviction on count forty-nine. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION